**Ex parte Joe SOROLA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 1112–87.**

Court of Criminal Appeals of Texas, En Banc.

March 1, 1989.

Rehearing Denied April 5, 1989.

Richard E. Langlois, San Antonio, for appellant.

Alger H. Kendall, Jr., Dist. Atty., and Stella Saxon, Asst. Dist. Atty., Karnes

City, Robert Huttash, State's Atty., Austin, for the State.

TEAGUE, Judge.

We granted the petition for discretionary review that was filed on behalf of Joe Sorola, henceforth appellant, in order to consider appellant's contention that the San Antonio Court of Appeals, see *Sorola v. State*, 737 S.W.2d 118 (Tex.App.–4th 1987), erred in not sustaining his claim that because of the Double Jeopardy Clauses of the Federal and State Constitutions, in the event of retrial and reconviction for capital murder, his punishment should be automatically fixed at life imprisonment.[1]

This Court's records reflect that in 1982 appellant was convicted by a jury of committing the offense of capital murder, i.e., he committed the offense of murder in the course of committing or attempting to commit the offense of robbery. See V.T.C.A. Penal Code § 19.03(a)(2).[2] Acting pursuant to Art. 35.25, V.A.C.C.P.,[3] the District Attorney notified the trial judge and appellant that he would not seek the death penalty. The jury was selected as though the case was going to be a non-death penalty case. The jury found appellant guilty of capital murder, after which the trial judge, and not the jury, assessed appellant's punishment at life im-

prisonment. The trial judge acted pursuant to his and the attorneys' interpretation of Art. 35.25, supra. The trial judge never, however, either expressly or implicitly, answered either of the mandatory special issues, see Art. 37.071, V.A.C.C.P., in the negative, nor did he make any finding, either expressly or implicitly, that was favorable to appellant. He simply assessed appellant's punishment at life imprisonment, believing that that was the only punishment available.

Appellant thereafter appealed his capital murder conviction and life sentence to the San Antonio Court of Appeals, which sustained his contention that the trial judge erred in discharging the jury and assessing his punishment at life imprisonment. See *Sorola v. State*, 674 S.W.2d 809 (Tex.App.–4th 1984).

The court of appeals rejected the State's argument that because the State was not seeking to have appellant's punishment assessed at death, and had expressly waived it pursuant to Art. 35.25, supra, the trial judge was authorized to assess appellant's punishment at life imprisonment. In rejecting the State's argument, the court of appeals relied upon this Court's decision of *Batten v. State*, 533 S.W.2d 788 (Tex.Cr.App.1976), which we find, although not directly on point, contains language therein that supports the holding of the court of appeals that in a capital murder prosecu-

1. This cause commenced when appellant filed his pretrial application for the writ of habeas corpus in the trial court pursuant to *Ex parte Robinson*, 641 S.W.2d 552 (Tex.Cr.App.1982) (held, a defendant may raise and appeal pretrial a double jeopardy claim).

2. Appellant does not assert that the State may not retry him for capital murder. As we understand his contention, it is that in the event of retrial and reconviction for capital murder, his punishment should be automatically fixed at life imprisonment.

3. Art. 35.25, supra, provides: "In non-capital cases and in capital cases in which the State's attorney has announced that he will not qualify the jury for or seek the death penalty, the party desiring to challenge any juror peremptorily shall strike the name of such juror from the list furnished him by the clerk." Also see Art. 1.14,

V.A.C.C.P., prior to amendment, that required the State, in the event it was going to seek the death penalty, to file written notice to this effect, and *Smith v. State*, 455 S.W.2d 748, 752–753 (Tex.Cr.App.1970), which held that under the then statute, "when the State has failed to give the prescribed written notice as required by Article 1.14, supra, that it will seek the death penalty, or has withdrawn such notice, already given, and announces ready and goes to trial before a jury, such action is tantamount to making it known to the court that the State will not qualify the jury on, or seek the death penalty...." Also see *Clardy v. State*, 436 S.W.2d 535 (Tex.Cr.App.1969); and *Elliott v. State*, 412 S.W. 2d 320 (Tex.Cr.App.1967). The Legislature subsequently deleted this requirement from Art. 1.14, supra.

tion the State cannot waive trial by jury or the death penalty, and the defendant cannot waive trial by jury on punishment if convicted of capital murder.

Thereafter, this Court granted the State's petition for discretionary review, after which it affirmed the judgment of the court of appeals. See *Sorola v. State,* 693 S.W.2d 417 (Tex.Cr.App.1985).

After this Court affirmed the judgment of the court of appeals, pursuant to *Ex parte Robinson,* supra, appellant filed an application for the writ of habeas corpus asserting therein that under the Double Jeopardy Clauses of the Federal and State Constitutions, in the event he is again found guilty of capital murder, his punishment should be automatically fixed at life imprisonment. The trial judge denied his application.

Appellant again appealed to the San Antonio Court of Appeals, which this time affirmed the trial court's decision to deny him any relief. See *Sorola v. State,* 737 S.W.2d 118 (Tex.App.–4th 1987).

In affirming the trial court's decision, the court of appeals treated the error that the trial judge had committed at appellant's first trial, by erroneously discharging the jury and assessing appellant's punishment at life imprisonment, as "trial error", and held that "Generally, double jeopardy does not attach when a case is reversed because of trial error. *Franklin v. State,* 693 S.W.2d 420 (Tex.Cr.App.1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986) and *Ex parte Duran,* 581 S.W.2d 683 (Tex.Cr.App.1979)." (119). The court of appeals went on to further hold: "Nor is this a case where the special issues of TEX.CODE CRIM.PROC.ANN. art. 37.071 (Vernon 1987) were decided in any factual manner. The trial court merely bypassed art. 37.071 and imposed a life sentence. This action does not constitute an implied finding against the imposition of the death penalty. A complete retrial because of the trial error that occurred does not subject appellant to double jeopardy." (119). The court of appeals finally held

that there was no evidence of prosecutorial vindictiveness on the part of the District Attorney in his efforts to reprosecute appellant for capital murder and, if convicted by the jury, have the jury, if possible, answer the special issues that would be submitted to it pursuant to Art. 37.071, V.A.C. C.P.

We will affirm the judgment of the court of appeals.

Art. 44.29(a), V.A.C.C.P., expressly provides:

> Where the court of appeals or the Court of Criminal Appeals awards a new trial to the defendant on the basis of an error in the guilt or innocence stage of the trial or on the basis of errors in both the guilt or innocence stage of the trial and the punishment stage of the trial, the cause shall stand as it would have stood in case the new trial had been granted by the court below.

Art. 44.29(c), supra, provides: "This section does not apply to convictions under Section 19.03 of the Penal Code (the capital murder statute). In such cases, the cause shall stand as it would have stood in case the new trial had been granted by the court below."

Thus, if reversible error is committed at the guilt stage of a capital murder trial, but not at the punishment stage of the trial, or if reversible error is committed at the punishment stage of a capital murder trial, but not at the guilt stage of the trial, the trial court's judgment and sentence must be set aside and the defendant is required to be granted a trial de novo on both guilt and punishment if he is retried, subject to the statutory law of this State and the case law of the Supreme Court of the United States and of this Court, which we will later set out and discuss in this opinion.

Previously, the law of this State was clear and absolute: the most that a defendant on appeal in a criminal case could receive was a trial de novo, and the double jeopardy clauses did not prevent retrial on either guilt or punishment.

In *Dupree v. State*, 56 Tex.Cr.R. 559, 120 S.W. 870, 873 (1909), this Court stated the following:

> In such a case [where this Court grants the defendant a trial de novo] the doctrine of former jeopardy has no application whatever, for the simple reason that there had been no final adjudication of the case.

Also see *Whitehead v. State*, 162 Tex.Cr.R. 507, 286 S.W.2d 947, 948 (1956) (held, "The reversal awarded appellant a new trial, and he could then be tried on the original indictment or on the new indictment. The law against double jeopardy is not offended in the present conviction. (Citations omitted.)." In dissenting opinion that Presiding Judge Onion filed in *Kutner v. Russell*, 658 S.W.2d 585, 591 (Tex.Cr.App.1983), he correctly pointed out the following: "In *Beardsall v. State*, 9 Tex.App. 262 (1880), it was held that the effect of the judgment of reversal was not merely to set aside the immediate proceedings of the court below from which the appeal was taken, *but was to place the entire cause in the same position in which it was before there was any trial of it.* See also *Cox v. State*, 7 Tex.App. 495 (1879); *Hughes v. State*, 68 Tex.Cr.R. 584, 152 S.W. 912 (1913)."

Thus, for many years, the law of this State was that the double jeopardy provisions of the respective Constitutions did not bar a retrial on either guilt or punishment after the defendant had succeeded on appeal in obtaining a reversal of his conviction, and this was true regardless of the reason for the reversal. "[T]he defendant was presumed in that instance to have waived any objection to being put a second time in jeopardy, and thus could be tried anew. See, for example, 1 *Bish.Crim.Law* (4th ed.) § 844; *Sterling et al. v. State*, 25 Tex.App. 716, 9 S.W. 45 (1888)." *Ex parte Martin*, 747 S.W.2d 789, 797 (Tex.Cr.App. 1988) (Teague, J., dissenting opinion).

■ Today, however, as a result of *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), also see *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), the Double Jeopardy Clauses of the Federal and State Constitutions can bar the State from reprosecuting the defendant if reversal occurs because the evidence is found to be insufficient. Furthermore, under the doctrine of collateral estoppel, if an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. See *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

■ The distinction between double jeopardy and collateral estoppel is that "the traditional bar of double jeopardy prohibits the prosecution of the crime itself, whereas collateral estoppel in a more modest fashion simply forbids the government from relitigating certain facts in order to establish the fact of the crime." *United States v. Mock*, 604 F.2d 341 (5th Cir.1979).

Because the issue that appellant presents to us to resolve only concerns the "punishment stage" of his capital murder trial, we will not concern ourselves with the applicability of either the double jeopardy clauses or the doctrine of collateral estoppel to the guilt stage of the trial.

Appellant argues in his brief that "the [previous] imposition of the life sentence by the trial [judge], even though erroneously imposed, was an implied finding of an acquittal with regard to the special issues Art. 37.071, V.A.C.C.P." (Emphasis supplied.) (Page 5 of Appellant's Brief on Appellant's Petition for Discretionary Review.) For reasons that we will give, we must disagree with appellant's argument.

There is no evidence before us that might reflect or indicate that the trial judge at appellant's first capital murder trial, either expressly or impliedly, "acquitted" appellant of the "death penalty", nor is there any evidence in the record that might reflect or indicate that when the trial judge assessed appellant's punishment at life imprisonment, he, the trial judge, made a favorable finding to appellant on an issue

of ultimate fact, i.e., there is no evidence that when he assessed appellant's punishment at life imprisonment the trial judge either expressly or implicitly answered either the "deliberateness" issue or the "probability" issue, see Art. 37.071, supra, in the negative.

In *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), for the first time in its history, the Supreme Court of the United States expanded the meaning of the Federal Double Jeopardy Clause to include the sentencing stage of the trial, where the first trier of fact resolved an issue or issues of fact in favor of the defendant.

In *Bullington,* supra, the defendant's first capital murder jury voted to assess his punishment at life imprisonment. The Supreme Court held that this "finding" impliedly acquitted the defendant "of whatever was necessary to impose the death sentence", 101 S.Ct. at 1861, thus causing it to hold that the prosecution was prohibited from getting a second "bite" at the death penalty at a second trial.

This Court adopted and applied the holding that the Supreme Court made in *Bullington,* supra, in *Cooper v. State,* 631 S.W. 2d 508 (Tex.Cr.App.1982) (held, as a matter of federal constitutional law compelled by *Bullington,* supra, because the State failed to sufficiently prove all of the facts necessary to find an enhancement paragraph "true" at the punishment stage of the defendant's trial, the State was barred from attempting at a new punishment hearing in that cause to prove its original enhancement allegations.) Also see *Ex parte Augusta,* 639 S.W.2d 481 (Tex.Cr.App.1982) (held, under either the Federal Constitution or the Texas Constitution, the State was precluded from relitigating an issue of fact at the defendant's second trial or at the second punishment hearing in the same cause because this Court found that it had failed to properly litigate that factual issue at the first trial or at the first punishment hearing.)

In *Arizona v. Rumsey,* 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), the trial judge, who under Arizona procedure was the "punisher" where the defendant had been found guilty by the jury of capital murder, conducted a punishment hearing in a cause in which the jury had found the defendant guilty of capital murder. The trial judge erroneously determined that there were no aggravating circumstances present in the defendant's case. This, of course, although an erroneous finding, was a favorable finding to the defendant. The error actually caused the trial judge to assess the defendant's punishment at life imprisonment rather than at death. The Arizona Supreme Court, after finding that the trial judge had erred, remanded the cause to the trial court for a new hearing on punishment. On remand, the trial judge, after conducting a new punishment hearing, assessed the defendant's punishment at death. The Arizona Supreme Court found that under *Bullington,* supra, the trial judge was prohibited from assessing the defendant's punishment at death and ordered the defendant's sentence of death reduced to life imprisonment. The Supreme Court affirmed the decision of the Arizona Supreme Court. In doing so, the Supreme Court stated the following:

> *In making its findings,* the trial court relied on a misconstruction of the statute defining the pecuniary gain aggravating circumstance. Reliance on an error of law, however, does not change the double jeopardy effects of a judgment that amounts to an acquittal on the merits. '[T]he fact that "the acquittal may result from erroneous evidentiary rulings or erroneous interpretations of governing legal principles" ... affects the accuracy of that determination, but it does not alter its essential character.' *United States v. Scott,* 437 U.S. 82, 98, 98 S.Ct. 2187, 2197, 57 L.Ed.2d 65 (1978) ... Thus, this Court's cases hold that an acquittal on the merits bars retrial even if based on legal error. 467 U.S. at 210, 104 S.Ct. at 2310. (Emphasis supplied.)

The Court went on to point out the following:

> [I]n respondent's initial capital sentencing there was only one decisionmaker

and only one set of findings of fact, all favorable to respondent. The trial court 'acquitted' respondent of the death penalty.... 104 S.Ct. at 2310.

In *Morris v. Mathews*, 475 U.S. 237, 106 S.Ct. 1032, 89 L.Ed.2d 187 (1986), the Supreme Court was confronted with the situation where the defendant and another individual robbed a bank. The other individual was thereafter killed in a farmhouse where he and the defendant had sought refuge from the police. The defendant was arrested at that location. It was originally suspicioned that the defendant's cohort had committed suicide. The defendant was charged with the bank robbery and thereafter pled guilty to the bank robbery, and his punishment was assessed at 25 years' confinement in the Ohio penitentiary. It was soon determined, however, after the defendant had pled guilty and was sentenced, that his cohort had not committed suicide but in fact was murdered by the defendant. A little over two weeks after the defendant had pled guilty to the bank robbery charge he was charged with the aggravated murder of his cohort, namely, causing his cohort's death while fleeing immediately after committing the aggravated robbery of the bank. The defendant's pretrial double jeopardy motion was denied, after which a jury found him guilty of aggravated murder. The trial judge assessed his punishment at life imprisonment. The prosecution appears to have agreed that it had violated the Federal Double Jeopardy Clause when it prosecuted the defendant for aggravated murder of his cohort. No one, however, contested the fact that the Federal Double Jeopardy Clause would not have barred the prosecution from seeking a simple murder conviction. Subsequently, the Ohio Court of Appeals modified the defendant's conviction and sentence, reducing the offense to murder and the sentence to 15 years to life. Ultimately, the Supreme Court of the United States approved the reductions. In doing so, it rejected the defendant's double jeopardy claim, holding that "when a jeopardy-barred conviction for a lesser included offense [here, murder] which is not jeopardy barred, the burden shifts to the defendant to demonstrate a reasonable probability that he would not have been convicted of the non-jeopardy-barred offense [here, murder] absent the presence of the jeopardy-barred offense [here, aggravated murder] ... To prevail in a case like this, the defendant must show that, but for the improper inclusion of the jeopardy-barred charge, the result of the proceeding probably would have been different." 106 S.Ct. at 1038. The case was remanded to the Ohio Court of Appeals for proceedings not inconsistent with what the Supreme Court had stated and held.

We find that all of the above cases are inapposite to the facts of this cause.

First, this cause does not implicate a finding of guilt for a lesser included offense of capital murder. Second, in the above cases in which the defendant was successful on his double jeopardy claim, there is a common thread, which does not exist in this cause, which is that the trier of fact or the "lawful punisher" made a favorable finding in the defendant's favor, either expressly or implicitly, at the punishment stage of his trial. In this instance, however, the trial judge never made a favorable finding, either express or implied, that the evidence was insufficient to support an affirmative finding to either of the mandatory special issues, see Art. 37.071, supra. Furthermore, under Art. 37.071, supra, where the jury has answered the submitted special issues, the punishment is actually assessed by law and not by the trial judge. In that instance, the trial judge has no say about the matter, and has no discretion to exercise in the premises. Where the defendant has been found guilty of capital murder, and the jury answers the submitted special issues, the law automatically fixes the defendant's punishment at either death or life imprisonment, depending on the jury's answers to the submitted special issues.

Contrary to *Rumsey*, where the trial judge by law was the authorized "punish-

er", the trial judge in this cause was not authorized by law to assess appellant's punishment, either as he did at life imprisonment or death.

The opinions relating to *Rumsey*, supra, make it clear that the procedure that was used in *Rumsey*, supra, was not the error that the Arizona Supreme Court found had occurred; the error occurred when, in assessing the defendant's punishment at life imprisonment, the trial judge relied on a misconstruction of the statute defining the pecuniary gain aggravating circumstance, which error caused him to make a favorable evidentiary finding to the defendant in that cause.

The jury at appellant's first trial was the only decisionmaker authorized by law to answer the special issues that should have been, but were not submitted to it pursuant to Art. 37.071, supra.

■ In *Sorola v. State*, 693 S.W.2d 417, 418 (Tex.Cr.App.1985), this Court pointed out the following: "In [*Ex Parte*] *Bailey* [626 S.W.2d 741 (Tex.Cr.App.1981)], we held that the trial court lacks the authority, even with the consent of both parties, to dismiss the jury and assess a life sentence after a defendant has been found guilty of capital murder by that jury." Thus, in this instance, the trial judge was not authorized to assess appellant's punishment at life imprisonment. Furthermore, as we previously pointed out, he did not make any favorable findings to appellant.

Because the jury in this cause was erroneously discharged by the trial judge, it never rendered a completed verdict on punishment; thus, there was no final verdict in appellant's first trial. See and compare *Eads v. State*, 598 S.W.2d 304 (Tex.Cr.App. 1980) (Held, where the jury answered one special issue but failed to answer the other two submitted special issues, the verdict was incomplete and the trial judge was not authorized to discharge the jury and complete the jury's verdict by in essence answering the unanswered special issues in the negative or assessing the defendant's punishment at life imprisonment.)

Nor do we find that any of the exceptions that presently exist in our law are applicable to this cause.

■ One exception that presently exists in our law is where the defendant, who is a juvenile certified to stand trial as an adult for committing the offense of capital murder, has been found guilty by the jury of capital murder. In that instance, the only possible punishment that might be assessed is life imprisonment. Thus, it is permissible for the trial judge to discharge the jury and assess the defendant's punishment at life imprisonment. See *Allen v. State*, 552 S.W.2d 843 (Tex.Cr.App.1977).

■ A second exception that exists in our law is where the defendant is on trial for capital murder and the jury finds him guilty of a lesser included offense, such as criminally negligent homicide. In that instance, the jury may be discharged by consent of the parties, and the trial judge may then assess the defendant's punishment within the range of punishment for that offense. See *Hicks v. State*, 664 S.W.2d 329 (Tex.Cr.App.1984).

Statutory law provides that if this Court finds the evidence insufficient to support an affirmative answer to any submitted special issue, and the prosecuting attorney, within 15 days after the date on which the opinion of this Court is handed down, files a motion requesting that the sentence be reformed to life imprisonment, this Court shall reform the judgment to show that the defendant's punishment is life imprisonment. See Art. 44.251, V.A.C.C.P.

Statutory law also provides that if the jury is unable to answer any of the submitted special issues, the trial judge is authorized in that instance to discharge the jury and assess the defendant's punishment at life imprisonment. Art. 37.071(e), supra.

Therefore, because the trial judge was not authorized to assess appellant's punishment at life imprisonment, and also because the trial judge, in assessing appel-

lant's punishment at life imprisonment, did not make any favorable findings to appellant, we overrule appellant's contention that "the imposition of the life sentence by the trial [judge], even though erroneously imposed, was an implied finding of an acquittal with regard to the special issues under Art. 37.071, V.A.C.C.P."

We also overrule appellant's contention, as we understand it, that the District Attorney is guilty of prosecutorial vindictiveness, not because he, the District Attorney, insists on reprosecuting appellant for capital murder, but because the District Attorney, in the event the second jury finds appellant guilty of capital murder, will insist that the second jury answer the special issues that will be submitted to it.

As previously pointed out, appellant's conviction for capital murder and his life sentence were set aside because the District Attorney, appellant's own attorney, and the trial judge all erroneously interpreted the law to permit the jury being discharged and the trial judge to assess appellant's punishment at life imprisonment.

It appears to us that what appellant is actually seeking is for this Court to order the District Attorney and the trial judge at the retrial, if any, to repeat the error that caused appellant's conviction for capital murder and life sentence to be set aside in his first appeal, which reversal occurred, not at the insistence of the trial judge or the District Attorney, but because appellant appealed his conviction and life sentence and raised that issue on appeal. We decline appellant's invitation.

We point out that neither this Court nor the court of appeals made any favorable evidentiary findings to appellant that would cause a bar to exist either to his retrial on guilt or to the submission of the special issues pursuant to Art. 37.071, supra, at the punishment stage of the trial in the event that the jury on retrial finds the appellant guilty of capital murder.

Given the circumstances of this cause, we find no prosecutorial vindictiveness. We also find that it would be ludicrous for us to hold that when a defendant gets a trial de novo, which he himself sought on appeal, and the prosecuting attorney thereafter seeks to reprosecute him for the crime for which he was convicted by a jury, and to have him punished pursuant to and in accordance with our law, and our law does not provide any bar to either event occurring, such constitutes prosecutorial misconduct.

The judgment of the court of appeals is affirmed.

MILLER and DUNCAN, JJ., concur in the result.

CLINTON, Judge, concurring.

In a criminal prosecution for a capital offense the attorney for the State inherently possesses power to abandon the death penalty and decline to qualify jurors on that punishment; from 1965 to 1973 failure of the prosecuting attorney to give written notice that the State would seek the death penalty was held to constitute waiver of capital punishment. See *Batten v. State*, 533 S.W.2d 788, at 790 (Tex.Cr.App.1976).[1]

In *Batten v. State*, supra, because attorney for the State did not file such written

1. Until 1965 "a complete jury trial was required where a alternate punishment could be 'death'— even though all parties were aware that such punishment was very remote." Erisman, *Introduction to 1965 Revision Texas Code of Criminal Procedure*, 1 Vernon's Code of Criminal Procedure xv, at xxiii (1977); see Interpretative Commentary following Article 1.15, V.A.C.C.P. The Special Committee of the State Bar of Texas for the Revision of the Code of Criminal Procedure recommended and the Legislature approved a revision of former article 11, C.C.P.1925, to sanction punishment other than death in a capi-

tal case when the State made known it will not seek the death penalty, defendant pled guilty before the court and waived trial by jury. *Ibid*; see Historical Note to Article 1.14, V.A.C.C.P. In 1967 the Legislature included pleas of nolo contendere and not guilty, and also modified Article 1.15 accordingly. Acts 1967, 60th Leg., ch. 659, p. 1733, §§ 1 and 2; see Historical Notes to each.

Putting aside fundamental questions of cruel and unusual punishment raised in, e.g., *Branch v. State*, 447 S.W.2d 932, at 934 (Tex.Cr.App. 1969), and resolved in *Furman v. Georgia*, 408

notice, the trial judge determined that capital punishment was not in the case and, therefore, limited accused to ten peremptory challenges and denied his motion to examine venirepersons individually and apart from other members of the panel. *Id.,* at 790. Addressing those issues, the Court

noted that in 1973 the Legislature made certain amendments to Articles 1.14, 35.15 and 35.17, V.A.C.C.P., "as part of the statutory scheme adopted for the trial of capital murder cases following the decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)." [2]

U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), we find diverse attacks on constitutionality of the 1965 revision, as amended, were considered at least thrice. See *Phillips v. State,* 701 S.W.2d 875, at 892 (Tex.Cr.App.1985). Reviewed *seriatim,* the 1965–1967 changes were so construed that they remained intact.

In *Sanchez v. State,* 454 S.W.2d 210 (Tex.Cr.App.1970), an unidentified claim was rebuffed with the comment that "Article 1.14 *merely puts a defendant on notice that the death penalty will be sought." Id.,* at 213 (emphasis here and throughout is mine unless otherwise indicated).

In *Short v. State,* 511 S.W.2d 288 (Tex.Cr.App.1974), accused attempted to waive trial by jury and have the judge assess punishment should a guilty verdict be returned, but his request was not in writing subscribed by him, and purported waiver was not approved by the State or the judge; his broad contention was that former articles 1.13 and 37.07 were unconstitutional. The Court noted that in *Furman v. Georgia* "it was not held that the procedure for waiving trial by jury as provided by our statutes was unconstitutional," and merely announced, "We decline to so hold here." *Id.,* at 291–292.

Drawing on *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the assertion was that former articles 1.13, 1.14 and 1.15 were unconstitutional in that "a defendant who insists on his right to trial by jury is subject to the death penalty." *Lane v. State,* 471 S.W.2d 854 (Tex.Cr.App.1971). The Court, speaking through the late Judge W.A. Morrison, quickly observed that *United States v. Jackson* could not then apply in Texas because "the defendant against whom the death penalty is sought cannot waive trial by jury," *ergo* "the articles in question [do not] 'needlessly *encourage'* guilty pleas and jury waivers as did the statute in Jackson, [footnoting 390 U.S. at 583, 88 S.Ct., at 1217 (emphasis by Supreme Court) ]."

In *United States v. Jackson,* supra, as the Supreme Court analyzed the Federal Kidnaping Act, a defendant who abandons the right to contest his guilt before a jury is assured that he will not be executed, whereas one who seeks a jury acquittal is forewarned that if found guilty and the jury declines to spare his life, he will die. From that perspective the Supreme Court discerned constitutional problems, *viz:*

"... The inevitable effect of any such provision is, of course, to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial. If the provision

had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional."
*Id.,* 390 U.S., at 581, 88 S.Ct., at 1216.
The Government claimed for Congress certain valid objectives, but the Supreme Court pointed out "they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights." So the question was whether the effect is "unnecessary and therefore excessive." The Government suggested alternatives, and the observation by Judge Morrison in *Lane v. State,* supra, was made relative to that part of *Jackson* rejecting the notion that "federal trial judges may be relied upon to reject coerced pleas of guilty and involuntary waivers of jury trial."
*Id.,* at 583, 88 S.Ct., at 1217.
As to another alternative, that the Supreme Court "should simply instruct federal judges ... to reject all attempts to waive jury trial and all efforts to plead guilty," and thus assure that every defendant charged with aggravated kidnaping would face the death penalty without being induced to forego a constitutional right, the Supreme Court was not persuaded:

"... [T]he inevitable consequence of this 'solution' would be to force all defendants to submit to trial, however clear their guilt and however strong their desire to acknowledge it in order to spare ... the spectacle and expense of protracted courtroom proceedings. * * * * Quite apart from the cruel impact of such a requirement upon those defendants who would greatly prefer not to contest their guilt, it is clear ... that the automatic rejection of all guilty pleas 'would rob the criminal process of much of its flexibility.' As one federal court has observed:
'The power of a court to accept a plea of guilty is traditional and fundamental. Its existence is necessary for ... practical ... administration of the criminal law.' "
*Id.,* at 584–585, 88 S.Ct., at 1217–1218.

2. According to the Practice Commentary following V.T.C.A. Penal Code, § 19.03, the Legislature "responded cautiously," and one effect is that a prosecutor may not waive the death penalty once an indictment for capital murder is presented, *viz:*

"... The offense's mandatory nature is the first of the constitutional bases touched by the legislature in recognition of the fact that three of the majority in *Furman* objected to the death penalty essentially because of its *discretionary application."*

Thus we are told a consideration prompting "nonwaiver" features of the revised statutory scheme was one of "caution," an undertaking to accommodate perceived concerns that existing procedures created a substantial risk the death penalty would be meted out in an arbitrary and capricious manner.[3]

Accepting the 1973 legislative changes in light of the Practice Commentary, the *Batten* Court found the trial court erred in holding the State had waived the death penalty and in limiting the number of peremptory challenges. The remaining question was whether such errors were reversible. 533 S.W.2d, at 790. Accordingly, the Court reviewed prior cases and those procedural changes to provide context for its decision.[4]

On the issue being decided, the *Batten* Court concluded that "the State may not waive the death penalty, but even in cases such as the instant one where such waiver has been improperly permitted, the capital case procedures, including the right to fifteen peremptory challenges, are still applicable *even though the only possible penalty under the circumstances would be life*

*imprisonment.*" *Id.*, at 793. Therefore, refusing fifteen peremptory challenges in "this capital case" was reversible error, and so was denying individual voir dire. *Id.*, at 793. The cause was remanded with a gratuitous observation that in event of a new trial death would be an applicable penalty. *Id.*, at 794, n. 7.[5]

Reduced to its essence, *Batten* stands for the proposition that it is not *reversible* error for a trial court to permit the prosecution to waive or abandon the death penalty in a capital case, but if it does then trial on guilt or innocence must comply with procedural trappings of a capital case, else on appeal the judgment will be reversed and the cause remanded for a new trial as a capital case in which death will be an available penalty. *Batten* thus denied exercise of inherent prosecutorial discretion and robbed the criminal justice system of much of its "flexibility" in a capital case.

However, *Batten* was decided without the edifying benefit of a cluster of opinions by the Supreme Court of the United States assaying state legislation in response to *Furman v. Georgia*, and to their teachings let us now turn.

*Batten,* supra, at 792.

3. Justice White opined capital punishment was being inflicted without "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not," *Furman,* 408 U.S., at 313, 92 S.Ct., at 2764; Justice Stewart believed petitioners were "among a capriciously selected random handful upon whom the sentence of death has in fact been imposed ... under a legal system that permits this unique penalty to be so wantonly and so freakishly imposed," *id.,* at 309–310, 92 S.Ct., at 2762; like views were expressed by Justice Douglas, *id.,* at 255–257, 92 S.Ct., at 2734–2736, and Justice Brennan, *id.,* at 291–295, 92 S.Ct., at 2753–2755.

Such comments are directed at end results of legislative designations and jury trials of capital murder offenses rather than to prosecutorial determination of persons to be put to trial—as the Supreme Court soon confirmed, see *post,* at 931–932.

4. Batten contended the Legislature had switched from a "penalty" outlook to a "category of cases" viewpoint, and argued that excluding consideration of the death penalty still left other procedures intact in that both the minimum and

maximum punishment is mandatory life imprisonment.

Relying on *United States v. Watson,* 496 F.2d 1125, at 1128–1129 (4th Cir.1973), a post-*Furman* trial in which the government did not seek the death penalty and defendant was sentenced to life imprisonment, the Court agreed that "in the wake of *Furman* the Legislature has adopted a 'category of cases' view and has adopted a mandatory procedure to be followed in capital cases where the extreme penalties of death or life imprisonment are involved," but it could not say that possibility of imposition of the death penalty was the only reason for mandating the procedures to be used in capital cases. *Id.,* at 792–793.

5. The Court did not find reversible error in improperly permitting the State to waive the death penalty. *Hicks v. State,* 664 S.W.2d 329 (Tex.Cr.App.1984): "*Batten* was reversed not because it was error per se to allow the State to purport to abandon the death penalty, but because such 'abandonment' did not authorize the court to abrogate the appellant's rights to 15 peremptory challenges and individual voir dire in a capital case." *Id.,* at 330.

In *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court rejected an assertion that "arbitrariness still pervades the entire criminal justice system of Texas—*from the prosecutor's decision whether to charge a capital offense in the first place and then whether to engage in plea bargaining,* through the jury's consideration of lesser included offenses, to the Governor's ultimate power to commute death sentences." That contention "fundamentally misinterprets the *Furman* decision," for the reasons set out in *Gregg v. Georgia,* 428 U.S. 153, at 199, 96 S.Ct. 2909, at 2937, 49 L.Ed.2d 859 (1976). *Id.,* 428 U.S., at 274, 96 S.Ct., at 2957; accord: *Proffitt v. Florida,* 428 U.S. 242, at 254, 96 S.Ct. 2960, at 2967, 49 L.Ed.2d 913 (1976).

Gregg contended changes made by Georgia in its sentencing procedures are only cosmetic, that "the arbitrariness and capriciousness condemned by *Furman* continue to exist in Georgia—both in *traditional practices that still remain* and in the new sentencing procedures adopted in response to *Furman.*" *Id.,* 428 U.S., at 198, 96 S.Ct., at 2937. His focus was on "the opportunities for *discretionary actions* that are *inherent* in the processing of any murder case under Georgia law." *Id.,* at 199, 96 S.Ct., at 2937.

Those "traditional practices" include exercise by the state prosecutor of *"unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them,"* as well as prerogative of a jury to convict of a lesser included offense rather than find him guilty of a crime punishable by death, and authority of Governor to commute a death sentence. However, the Supreme Court found existence of those "discretionary stages" was not "determinative of the issues before us," *viz:*

"... At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman,* in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. *Nothing in our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman* held only that ... the decision to impose [the death penalty] had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant."

*Id.,* 428 U.S., at 199, 96 S.Ct., at 2939 (original emphasis). Moreover:

"The petitioner's argument is no more than a veiled contention that *Furman* indirectly outlawed capital punishment by placing totally unrealistic conditions on its use. In order to repair the alleged defects pointed to by petitioner, it would be necessary to require that *prosecuting authorities charge a capital offense whenever arguably there has been a capital murder and that they refuse to plea bargain.* If a jury refused to convict ... its verdict would have to be reversed and a verdict of guilty entered or a new trial ordered.... Finally, acts of executive clemency would have to be prohibited. *Such a system, of course, would be totally alien to our notions of criminal justice.*

Moreover, it would be *unconstitutional.* * * * *"

*Ibid.,* n. 50.

Furthermore, in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976), and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the Supreme Court struck down legislation providing for mandatory death penalty. On the issue under investigation here, Justice White, joined by the Chief Justice and Justice Rehnquist, for the reasons stated in his dissenting opinion in *Roberts v. Louisiana,* rejected arguments that the North Carolina statute "will nevertheless result in the death penalty being imposed so seldom and arbitrarily that it is void under *Furman v. Georgia.*" *Woodson,* 428 U.S., at 307, 96 S.Ct., at 2992.

In *Roberts v. Louisiana,* joined by three members, Justice White, rebuffed attacks on the death penalty; on the matter of prosecutorial discretion, Justice White was not convinced that the Louisiana statute was "substantially more vulnerable because *the prosecutor is vested with discretion as to the selection and filing of charges [or] by the practice of plea bargaining ...,*" reasoning:

"... Of course, someone *must* exercise discretion and judgment as to what charges are to be filed and against whom; but this essential process is no more than the rational law enforcement of the State's criminal law and the sensible operation of the criminal justice system. The discretion with which Louisiana's prosecutors are invested and which appears to be no more than normal, furnishes no basis for inferring that capital crimes will be prosecuted so arbitrarily and infrequently that the present death penalty statute is invalid under *Furman v. Georgia.*"

*Id.,* 428 U.S., at 348–349, 96 S.Ct., at 3013 (emphasis in original).[6] As to plea bargaining, Justice White similarly reacted, *viz:*

"... A prosecutor may seek or accept pleas to lesser offenses where he is not confident of his first-degree murder case, but this is merely the proper exercise of the prosecutor's discretion as I have already discussed.... Whatever else the practice may be, it is neither inexplicable, freakish, nor violative of the Eighth Amendment. Nor has it been condemned by this Court under other provisions of the Constitution."

*Id.,* 428 U.S., at 349, 96 S.Ct., at 3013.[7]

Therefore, contrary to legislative perception in 1973, the concern of the Supreme Court in *Furman v. Georgia* regarding constitutionality of imposition of capital punishment was not with exercise of normal prosecutorial discretion, plea bargaining and correlative waiver of trial by jury. However appealing the exposition of its understanding of legislative design in early 1976, the *Batten* Court could not anticipate that by summertime rationale for finding the trial court erred in holding the State had waived the death penalty would be rejected by *Gregg v. Georgia, Jurek v. Texas, Proffitt v. Florida, Woodson v. North Carolina* and *Roberts v. Louisiana.*[8]

All things considered, then, one must conclude that exercise of normal prosecuto-

---

**6.** The Court would later affirm that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). With the same understanding this Court has declined to hold our statutory scheme unconstitutional on that account. *Fearance v. State,* 620 S.W.2d 577, at 581 (Tex.Cr.App.1981). Of course, prosecutorial discretion is not without constitutional restraints against invidious discrimination. *Wayte v. United States,* 470 U.S. 598, 608–609, 105 S.Ct. 1524, 1530–1531, 84 L.Ed.2d 547 (1985).

**7.** The allusion is to decisions acknowledging and approving the practice of plea bargaining, e.g.:

*Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); *Parker v. North Carolina,* 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

See also *Bordenkircher v. Hayes,* supra.

**8.** Since then the Court has routinely canted that feature of *Batten,* while ignoring its conclusion that "the only possible penalty under the circumstances would be life imprisonment," *Batten,* supra, at 793.

Apparently the first opportunity to consider impact of *Gregg v. Georgia,* et al., was presented in *Ex parte Dowden,* 580 S.W.2d 364 (Tex.Cr. App.1979), and the Court divided over the matter. An indictment charged accused with a capital felony; prosecutor negotiated a plea bargain to waive the death penalty; accused pled guilty and waived trial by jury; the judge assessed punishment at life imprisonment. In his *pro se* petition for postconviction habeas corpus relief, applicant claimed that in the premises the State may not waive the death penalty and an accused cannot waive trial by jury. Following *Batten,* over protestations by the late Judge Leon Douglas and two other Judges that "to deny both the State and the defendant the ability to plea bargain in an appropriate case [was] condemned in *Gregg [v. Georgia],*" id., at 368, a majority granted relief.

Seemingly sensitive to the dissent, the lead opinion pointed out, "Nothing in *Batten* held

rial discretion is not at all incompatible with a constitutional death penalty scheme, and the traditional practice of plea bargaining for punishment less than death is consistent with rational law enforcement and sensible operation of our criminal justice system. *Roberts v. Louisiana,* supra, (Justice White dissenting, see *ante* at 932). In those lights, to adhere to *Batten* and its progeny is to perpetuate a scheme that is "alien to our notions of criminal justice"— if not unconstitutional. Accordingly, guided by construction aids prescribed in V.T.C. A. Government Code, Code Construction Act, especially § 311.023, we may construe the 1973 amendments to germane statutes to give meaning and effect to that inescapable conclusion.

While apparently apprehensive about "discretionary application" of the death penalty, the Legislature did not in terms proscribe "waiver" of the death penalty by the prosecuting attorney in a capital felony case. It deleted former provisions in Article 1.14 which the Court took to be no more

functional than to "put a defendant on notice [at least 15 days prior to trial] that the death penalty will be sought by the state." *Sanchez v. State,* supra, at 213. Beyond that, it omitted procedures available to an accused when the State made known it would not seek the death penalty. But withdrawal of mere procedures is not to deny prosecutorial power or to impinge on prosecutorial discretion, nor to prohibit implementation of a plea bargain agreement, and exercise of those powers are not now necessarily defeated by what remains of Article 1.14.

Today an arraignment at which a plea of guilty or nolo contendere is made and entered is part of a criminal prosecution, and a plea bargain may be an integral consideration in that procedure. The proceeding accomplishes several purposes and requires an admonishment by the court of consequences of the plea, including viability of any plea bargain agreement. Articles 26.-01–26.04, 26.11 and 26.13, V.A.C.C.P.

But in 1973, with its amendment to Article 26.13, C.C.P., to conform to the "new"

---

that the State could not reduce a charge of capital murder to any lesser included offense ...," *id.,* at 366, n. 3; the concurring opinion noted that "the State was not precluded from dismissing the capital felony indictment in order to proceed on an indictment or information for the lesser included offense of murder [and then strike] a valid plea bargain," *id.,* at 367. Compare *Ex parte McClelland,* 588 S.W.2d 957 (Tex.Cr.App.1979) (relief denied where state reduced capital murder to murder, accused waived jury and entered guilty plea before court which assessed punishment at life imprisonment; reliance on *Ex parte Dowden* misplaced).

*Ex parte Dowden* begat *Ex parte Jackson,* 606 S.W.2d 934 (Tex.Cr.App.1980) (*Ex parte Dowden* dispositive—offense not reduced to lesser included offense of murder prior to guilty plea and waiver of jury); *Ex parte Bailey,* 626 S.W.2d 741 (1981) (where after jury found defendant guilty of capital murder he withdrew request for jury to assess punishment on agreement of State and guarantee by court to assess life imprisonment, relief granted per *Ex parte Dowden* and *Ex parte Jackson,* and because "verdict is not complete until jury has rendered a completed verdict on punishment," citing *Eads v. State,* 598 S.W.2d 304 (Tex.Cr.App.1980)—over dissent of Judge McCormick, joined by Judges Odom and W.C. Davis); *Ex parte McKinney,* 688 S.W.2d 559 (Tex.Cr.App.1985) (accused executed written waiver of right to jury trial, pleaded guilty to capital murder and court assessed punishment at life, entitled to relief under *Dowden* et al.);

*Sorola v. State,* 693 S.W.2d 417 (Tex.Cr.App. 1985) (*Ex parte Bailey* is "controlling"). Overlooked throughout was prosecutorial power to exercise discretion in controlling prosecution for a capital felony offense in behalf of the State. See *Fearance v. State,* supra; Interpretive Commentary following Article V, § 21, 2 Vernon's Texas Constitution 304 (1955).

*Eads v. State,* supra, is *sui generis.* After a jury found accused guilty of capital murder, the trial court charged the jury on punishment, including an instruction that if any special issue was not answered unanimously "yes" or fewer than ten jurors voted "no," "then there shall be no answer for that Special Issue and the Foreman should not sign his name to any answer form for that Special Issue," *id.,* at 306, n. 1; presumably responsive to that instruction the jury returned a verdict in which special issues 1 and 2 were not answered, but special issue 3 was answered "yes;" the judge accepted that verdict, discharged the jury and assessed punishment at life. The Court found the verdict was incomplete, the trial judge erred in accepting it and in applying his own interpretation of Article 37.071, V.A.C.C.P., assessing punishment accordingly. So much for allowing an opportunity for a jury to afford mercy. *Gregg v. Georgia,* supra. (N.B. Article 37.071, § (e), has since been amended to achieve just such result when the jury is "unable to answer" any special issue submitted thereunder.)

penal code, the Legislature continued to preclude acceptance of such pleas "unless it plainly appears that [accused] ... is uninfluenced by any consideration of fear, or *by any persuasion*, or delusive hope of pardon, prompting him to confess his guilt." Acts 1973, 63 Leg., Ch. 399, p. 969, § 2(A). However, because "persuasion" included "promise," the usual inquiry was more a litany to provide a record of "deniability" as to prior arrangements regarding punishment. See, e.g., *Erdelyan v. State*, 481 S.W.2d 843, at 846–847 (Tex.Cr.App.1972); *Johnson v. State*, 442 S.W.2d 744 (Tex.Cr. App.1969). The reality of parties negotiating a plea bargain agreement was outside the scope of legislative ken.[9]

After *Gibson v. State*, supra, see note 10, *ante,* revealed the hypocrisy of it all, *id.,* at 75–76, remedial action was taken. Acts 1977, 65th Leg., Ch. 280, p. 748 (court shall inquire into plea bargain agreement and state whether it will follow or reject it *et cetera* ), and Ch. 351, p. 940 (defendant granted limited right of appeal where court followed agreement); see also refinements made by Acts 1979, 66th Leg, Ch. 524, p. 1108 and Ch. 561, p. 1160.

So we find that in 1973, while it may have labored under misplaced caution over implications of views expressed by some Justices in *Furman v. Georgia*, the Legislature did not regard the process of negotiations leading to a plea bargain agreement as matter of public policy to be reckoned with in formulating a capital punishment scheme; on that basis we may further conclude that the Legislature did not rule out exercise of prosecutorial discretion to negotiate pleas for punishment other than death.

Consideration of all such matters, as well as those enumerated in § 311.023, supra,

justifies a rational opinion that a measure of normal prosecutorial discretion survived enactment of the capital punishment scheme in 1973, and I would so hold. Whatever its ultimate dimensions we need not determine today, for in the instant cause its exercise was quite discrete.

First of all, applicant did not waive trial by jury on merits of the indictment—several defensive issues were in the case. Implicated here is Article 35.25, *viz:*

> "In non-capital cases and *in capital cases in which the State's attorney has announced he will not qualify the jury for, or seek the death penalty*, the party desiring to challenge any juror peremptorily shall strike the name of such juror from the list furnished him by the clerk."

Though the record does not reflect the fact, before the court of appeals the parties represented, and the majority says, that prior to voir dire the prosecuting attorney announced that the State was not seeking, and thus would not qualify jurors on, the death penalty. Brief for Appellant, at 2; Appellee's Brief, at 4. Whether articulated to the trial court, the State also represented to the court of appeals that it was relying on Article 35.25. *Ibid.* In the event, voir dire was conducted and jurors were selected accordingly. The trial court charged the jury on capital murder and murder; the jury returned a verdict finding applicant guilty of capital murder.

That the district attorney may have relied on his view of Article 35.25 means only that he found what he believed to be statutory support for his discretionary determination to "abandon" the death penalty. Reading the statute literally, he is correct. *Batten* does not hold otherwise because the

---

**9.** The amiable fiction then in vogue was an accused never pled guilty or nolo contendere through persuasion of a plea negotiated by his lawyer with the prosecutor; thus the charade in which an accused was required to make false negative responses to questions from the judge lest he betray his bargain. Even when fiction became fact, in this respect the judge was required to admonish an accused merely of "the fact that any *recommendation* of the prosecut-

ing attorney as to punishment was not binding on the court." Acts 1975, 64th Leg., Ch. 341, p. 909, § 3.

In short, circa 1973 legislators and judges would not officially acknowledge the plea bargaining process, and a sense of circumspection kept attorneys for the State and accused from "bringing the fruit of negotiations out of the closet and into the record." *Gibson v. State.* 532 S.W.2d 69, at 76 (Tex.Cr.App.1975).

Court does even not mention Article 35.-25.[10]

In *Batten* the Court believed "the obvious intent of the Legislature [was] reflected in the [amendments which] expressly eliminated reference to giving such notice." *Id.*, at 793. Yet, the Legislature retained three articles which *did* refer to "making it known" whether the State was seeking the death penalty.

According to *Sanchez*, supra, the essence of what was eliminated in Article 1.14 was a fifteen day written notice requirement for the benefit of accused should the State be seeking the death penalty. Notice that the death penalty would not be sought provided an opportunity for the accused to plead guilty. But both such "notice" provisions necessarily rest on an assumption that a prosecutor possesses the power to pursue or abandon the death penalty, and merely repealing procedural provisions will not *ipso facto* strip attorneys for the State of prosecutorial discretion to exercise either option in the premises. See *ante*, at 930–932, 933.[11]

The scheme mandates that punishment for an accused found guilty of capital murder must be either death or life imprisonment. Real concern of the Supreme Court was with only procedures by which a "sentencer" is authorized to determine to impose the death penalty, not with any lesser alternative punishment. Therefore, to recognize options available to the prosecuting attorney is but to acknowledge "traditional practices" that are neither "irrational, inexplicable, freakish nor violative of the Eight Amendment." See *ante*, at 932. If the Eighth Amendment will not prohibit a prosecutor from exercising his discretion to seek a punishment other than death in a given case before trial, surely it does not condemn his doing so during the course of a trial.

With that understanding, legislative handiwork in Chapter Thirtyfive is completely reasonable and entirely consistent. Indeed, some is merely "housekeeping" in nature. The affected provisions are examined *seriatim* in the margin.[12]

In the instant case, the State having utilized Article 35.25, after the jury returned

**10.** Having already considered amendments to Articles 1.14, 35.15 and 35.17, and provisions of the statutory scheme relating to criminal homicide and capital punishment, and determined that the Legislature adopted "a 'category of cases' view" in 1973, when faced with the contention that, since Article 35.13 still provides that "in a capital case in which the state has made known it *will* seek the death penalty," the State was either required or allowed "to continue to give notice if [it] seeks the death penalty," the *Batten* court decided that language was "possibly *overlooked*," and "does not, in our opinion, nullify the obvious intent of the Legislature as reflected by the later enactments." *Id.*, at 793. It gave like short shrift to similar language in Article 35.16(b)(1) (challenge for conscientious scruples). *Ibid.* n. 6. If true, then also overlooked was language—"when the State's attorney has announced that he will *not* qualify the jury for, or seek the death penalty"—in Article 35.25.

Such an explanation is difficult to accept, however. All five provisions are in Chapter Thirtyfive, "Formation of the Jury." A reasonably prudent amender going through the chapter article by article looking for such language would come first to Article 35.13, then in close order Articles 35.15, 35.16(b)(1), 35.17 and, finally, 32.25. That a Legislature said to be bent on removing discretion could "overlook" the

first, third and fifth provisions while amending the second and fourth provisions seems most unlikely.

Granting that the 1965 revisers integrated many former provisions treating the subject separately in chapters for capital cases and cases not capital, respectively, see title 8, chapter 3 and chapter 4, C.C.P.1925, but segregated some others, in my judgment the three articles in question were not "overlooked" by the Legislature in 1973. Furthermore, under a presumption that the Legislature uses words for a purpose, an appellate court is charged with giving effect to each word, phrase, clause and sentence if reasonably possible.

**11.** Certainly nothing in the "new" capital punishment scheme expressly restrains the legal representative of the State from performing "a higher duty than the mere securing of convictions," *Bullington v. State*, 78 Tex.Cr.App. 187, 180 S.W. 679, at 681 (1915), or from discharging "a duty as well to the accused as to the commonwealth in the trial of cases," *Black v. State*, 65 S.W. 906, at 907 (Tex.Cr.App.1901), to "see that justice is done," Article 2.01, V.A.C.C.P.

**12.** Article 35.13, "Passing Juror for Challenge," initially "integrated" in 1965, was amended in Acts 1967, 60th Leg., Ch. 659, § 20, to insert "in a capital case in which the State had made known it *will* seek the death penalty," thereby

its verdict of guilty the following colloquy ensued:

> THE COURT: All right, Gentlemen, ... the jury having returned a finding o[f] guilty [on the] offense of capital murder, as charged in the indictment ..., this being a capital offense, that is the work of the jury panel would be complete, in other words there is nothing further for the jury to determine, as the Court understands the law.
>
> I wanted to mention this ... to see if [you] understood it differently.
>
> [DEFENSE COUNSEL]: I think the Court is exactly correct on that.
>
> THE COURT: The Court sees no alternative except to the sentencing. As the Court understands the statute, it is up to the Court, and not to the jury, since the State is not asking for the death penalty in this case. Is this understood by both sides that way?
>
> THE STATE: That is the way the State would understand it, Your Honor.

Then "as a matter precaution," the judge first held an off the record discussion with applicant and his counsel, after which the record reflects the court directly addressed applicant, displayed the jury verdict and read it aloud, explained in some detail what

had been said before and drew from each confirmation that "there is no legal reason why sentence should not be pronounced at this time." Accordingly, the court formally sentenced applicant to confinement for life.

In the court of appeals the local district attorney and later in this Court he and the State Prosecuting Attorney defended what the trial court and the parties had done, and supported the judgment thus rendered. Essentially they contended prosecutorial discretion as to punishment extends to that phase of trial and because, *inter alia,* Article 37.071, § (a) allows the prosecution to present argument "against sentence of death" (and consistently with having previously abandoned the death penalty and its related procedures prosecutors practically would be obliged to do so), to involve the jury in a punishment proceeding "serves no legitimate purpose," Appellee's Brief, at 7; "the legislative policy ['nobody can get the *death* penalty unless a *jury,* not the judge, says so'] ... is not frustrated where *the judge* assesses a *life* sentence with the consent of all parties." State's Motion for Rehearing, Attachment, at 7 (emphasis by the State).[13]

For all reasons developed *ante,* and in the facts and circumstances presented,

---

making clear that the procedure applicable only in such capital cases. See, e.g., *McClain v. State,* 432 S.W.2d 73, at 75 (Tex.Cr.App.1968); *Elliott v. State,* 412 S.W.2d 320, at 321 (Tex.Cr.App.1967); *Fuller v. State,* 409 S.W.2d 866, at 869 (Tex.Cr.App.1966).

In Article 35.15, § (a), providing fifteen challenges in "capital cases," was left alone; § (b) was kept for "non-capital felony cases," removing those "capital cases where the state has made known to the court that it will *not* seek the death penalty." Obviously, the latter clause simply became redundant.

Article 35.16(b)(1) continued to provide that where the State *is* seeking the death penalty, one valid challenge be that the juror has conscientious scruples against the death penalty.

From Article 35.17 was removed specification of certain cases, including "a capital case in which the state's attorney has made known that he will *not* seek the death penalty," so that in every case (except in a capital felony case, as would be provided in § (2)), voir dire would be conducted before the entire panel; § 2 substituted "In a capital felony case" for "When the state's attorney has made known that he *will*

seek the death penalty," retained the requirement that the court propound to venirepersons en masse questions about principles of law, as well as the option upon demand by either party for individual and separate voir dire of each prospective juror. Thus the substance of Article 35.17 was altered only in that the latter procedure applied regardless of what the prosecutor "has made known."

Finally, if the prosecutor announced he would *not* qualify the jury for, or seek the death penalty, peremptory challenges (not to exceed fifteen) were still to be made by striking names from the list of venirepersons pursuant to Article 35.-25.

**13.** In the court of appeals applicant acknowledged "that this action on the part of the Learned Trial Court was acquiesced in both by the State and the Defendant[.]" Brief for Appellant, at 2. As shown above, of that there can be no doubt, and only a strangely alien and culturally barbaric doctrine would mandate that an accused insist upon being exposed to risk of death.

therefore, I conclude that this conviction as well as the sentence is valid, and further that in *Sorola v. State*, 693 S.W.2d 417 (Tex.Cr.App.1985), we erroneously affirmed the judgment of the court of appeals in *Sorola v. State*, 674 S.W.2d 809 (Tex.App.—San Antonio 1984).

Which brings us to the judgment of the court of appeals in this cause. *Sorola v. State*, 737 S.W.2d 118 (Tex.App.—San Antonio 1987). The ultimate reason given for its decision by the San Antonio Court is in that what occurred below is "trial error" jeopardy "does not attach." *Id.*, at 119. Since I am convinced there was no "trial error"—error against whom?—I cannot agree.

Finally, we come to the question of whether applicant is entitled to relief.

The majority brings up and discusses varied aspects of this problem, but ultimately settles on two reasons: the trial court was without authority to assess punishment at life imprisonment, and in doing so the court "did not make any favorable findings [to special issues under Article 37.071, V.A.C.C.P.]." Slip opinion, at 12. Because those two reasons seem inherently contradictory—if the trial court lacked authority in the first instance, it should not make any such findings—only the matter of "authority" will be addressed.

The first time around, as had the San Antonio Court of Appeals, this Court determined in *Sorola v. State*, supra, 693 S.W.2d, at 417, that *Ex parte Bailey*, supra, was "controlling," *id.*, at 419. However, *Ex parte Bailey* in turn relied on *Ex parte Jackson* and *Ex parte Dowden*, both supra, as well as *Eads v. State*, supra. *Bailey* and *Jackson* are direct progeny of *Batten*, and *Eads* was mooted by subsequent amendment to Article 37.071, § (e). See *ante*, at note 8. In my view, then, *Ex parte Bailey* is not controlling. And, as stated above, my own conclusion is that

this conviction for capital murder and the sentence are valid, so the question must be answered free of impedimenta of those decisions.

As mentioned *ante*, applicant preserved at trial and raised on appeal several real "trial errors" bearing on the verdict of guilt. The San Antonio Court of Appeals addressed two and overruled the points of error. Thus, except for its sustaining the point of error going to lack of authority in the trial court to assess punishment, the San Antonio Court would have affirmed the judgment of conviction and life sentence. See *Sorola v. State*, 674 S.W.2d, at 810–813.

Were the jeopardy issue in this cause presented in context of a *reversal* of the judgment of conviction by the San Antonio Court for one or more of such errors affecting the guilty verdict, I would be inclined to examine the jeopardy claim on a theory akin to the doctrine of "law of the case;" that is, having abandoned capital punishment at the outset, the district attorney is now precluded from seeking the death penalty on a new trial. However, that is not this case.

On motion for new trial (Tr. 80), and thereafter on appeal (Brief for Appellant, at 11–14), applicant invoked Article 1.14 to contend that it was error for the trial court to assess punishment instead of the jury. On that point of error—and solely on that point—he achieved the reversal for which he prayed. As the majority points out, the general rule in that circumstance is that the doctrine of former jeopardy has no application.[14]

Therefore, I join the judgment of the Court affirming denial of relief.

---

14. While the jeopardy doctrine applies to a capital sentencing proceeding in which the same jury must make factual determinations as to whether the death penalty is to be imposed, *Bullington v. Missouri*, 451 U.S. 430, at 445–447, 101 S.Ct. 1852, at 1961–1862, 68 L.Ed.2d 270 (1981), and in which the trial judge makes those determinations, *Arizona v. Rumsey*, 467 U.S. 203, at 211–212, 104 S.Ct. 2305, at 2310, 81 L.Ed. 164 (1984), it appears to be inapplicable when the matter is not submitted to the factfinder in that there has not been a determination "that amounts to an acquittal on the merits." *Ibid.* Also see *United States v. Scott*, 437 U.S. 82, 89, 98 S.Ct. 2187, 2197, 57 L.Ed. 65 (1978).