No. 413. BONDHOLDERS, INC. *v.* POWELL ET AL., RE-CEIVERS, ET AL. C. A. 4th Cir. Certiorari denied. MR. JUSTICE FRANKFURTER has filed an opinion in connection with the denial of the petition for writ of certiorari. *Frank B. Gary, Jr.* and *Aubrey R. Bowles, Jr.* for petitioner. *James B. McDonough, Jr., Harold J. Gallagher, Leonard D. Adkins* and *W. R. C. Cocke* for respondents.

Opinion of MR. JUSTICE FRANKFURTER in connection with the denial of the petition for writ of certiorari.

On more than one occasion I have indicated the inherent bars to stating, however briefly, the reasons for denying petitions for certiorari. See, *e. g., Maryland v. Baltimore Radio Show,* 338 U. S. 912, 917–918. The practical administration of justice, not any interest of secrecy, precludes. Since the denials of petitions for certiorari cannot be accompanied with explanations, a public recording of a dissent from such a denial cannot, without more, fairly disclose to what such dissent is directed. The ambiguous and unrevealing information afforded by noting such dissent is rendered still more dubious if dissent is not noted systematically, but only in selected cases. For these and reinforcing reasons it has been my unbroken practice not to note when I have dissented from the denial of petitions by the Court.

It has also been my view, however, that it becomes appropriate from time to time to set forth some of the issues that may be involved in a case in which a petition for review here is denied. This is such an instance.

In December 1930 the Seaboard Air Line Railway Company, operator of railway lines in the southeastern States, defaulted on its debts as they fell due. It applied to the Federal District Court in Virginia for a moratorium. This was granted and the control and management of the road were thereupon transferred to the Dis-

trict Court, functioning through receivers. In December 1943 the District Court announced its readiness to give up control upon terms drawn from doctrines of this Court. See *Ecker* v. *Western Pacific R. Corp.*, 318 U. S. 448; *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.*, 318 U. S. 523.

The District Court required drastic changes in the ownership of the property and in the respective rights of the beneficial owners as between themselves. Only some of the Seaboard securities were to be permitted to share in the ownership of the railroad; others were to be eliminated. The removal of the junior securities from the Seaboard scene and the delivery of the entire property to the senior securities deprived the junior securities of nothing—so it was assumed. The District Court concluded that the dispossessed securities, both bonds and stock, were worthless on the forecast that the Seaboard would never earn enough to yield an income on these junior securities. The District Court assumed, as did this Court in 1943, that the future earnings of a railroad could be estimated with substantial accuracy. Any error in such computation was deemed to be insubstantial, so that the amount of the destroyed junior securities that might have been saved had error been avoided would likewise be negligible.

The elimination of the junior securities was naturally reflected in an alteration of the financial structure of the Seaboard. This was deemed desirable in any event in order to simplify that structure. It became impossible to preserve intact the respective positions of the holdings that survived the reorganization plan, that is, the rights as between themselves fixed in the terms of the old securities. But it was thought that substantially fair substitutes for those older securities and those rights would be afforded by the new financial structure. Thus, in the case of senior securities which had a senior claim on the

income of specified portions of the Seaboard property, the amount of the future income of each of these portions could be computed in advance by the District Court and the new securities offered in exchange for the old would be based on such computation. Such a view obviously assumed the practicability of computing with substantial accuracy the future earnings of different portions of the Seaboard system, just as the doctrine justifying the abolition of junior securities assumed the practicability of computing with substantial accuracy future earnings of the whole Seaboard system.

The presuppositions of this judicial attitude toward railroad financial problems in the depression and post-depression eras were applied by the federal courts in a number of railroad cases. The validity of these principles came under criticism, both in and out of Congress, in part by comparing the estimates of future earnings made by experts whose views District Courts had followed, with the subsequent actual earnings of the roads Extensive studies of this nature were made by the Senate Committee on Interstate Commerce in 1945 and 1946 Since these Senate investigations, six more years of actual earnings furnish the means of testing the earlier estimates. The facts now available as to the Seaboard are illuminating.

The doctrines formulated by this Court on the basis of abnormal depression and early war years—before the implications of the accelerated momentum of economic expansion were generally appreciated—require District Courts to make two basic prophecies: a road's future earnings and the income rate on bonds and other securities appropriate for the future. From these two figures is derived, largely, the total amount of new securities under a new capitalization of a reorganized railroad. Put in over-simplified terms, the procedure for determining a new financial structure is something like this. The face

amount of a security, say $1,000, is settled and the interest rate of that security, say 4%. The annual income of such a bond is therefore computed to be $40. Reversing the sequence, by taking first the income yield of $40 and the interest rate of 4% it is deduced that the face amount of the bond is $1,000. This is arrived at by using the multiplier 25, fixed by the interest rate, and multiplying the dollar yield and the multiplier to ascertain the capital amount of the security.

In the estimate of the two basic figures errors may enter in either or both. The highest probability of error and the largest amount of possible error is with respect to the estimate of future earnings. Thus, assuming a 4% interest rate and therefore a multiplier of 25, and esti-mating the average annual earnings of the Seaboard at $7,500,000, the formula would lead to a capitalization of $187,500,000. This amount of securities would then be distributed to the owners of the Seaboard's pre-receivership securities in the order of the seniority or priority of their old securities. If the amount of new securities is insufficient to provide anything for the old junior bondholders and stockholders, their old securities, being thus proved worthless, would be wiped out.

If, however, the future average earnings were estimated not at $7,500,000 but at $16,500,000 per year, the same multiplier as before, 25, would produce a capitalization of $412,500,000. The difference between the capitalizations based on two different estimates of earnings would be $225,000,000. This amount would be the measure of the old junior securities saved by the higher estimate of earnings but destroyed as valueless by the lower estimate. In many reorganizations older methods of valuation are given some, usually minor, weight, e. g., book figures on which the Interstate Commerce Commission approved the issue of securities, reproduction cost less depreciation, etc., etc.

When the District Court in 1943 approved the destruction of junior Seaboard securities, it did so by accepting the estimate of $7,500,000 as the future annual earnings of the road. Since that estimate was made and judicially decreed, the average annual earnings for almost a decade have been $16,500,000. (The figures of earnings for 1943–1951 are reported earnings; real earnings may be higher, even though accounting technique may not wholly reflect them. The figures here given for estimated and actual earnings are in round sums.)

On such a showing, what amount of the old Seaboard securities were unjustly destroyed? This might be computed by indulging in a new estimate, comparing it with the $7,500,000 estimate and multiplying the difference by the multiplier of 25. Or the computation can be based on the earnings in fact made since the original estimate. On the latter basis we find that at least $81,000,000 of old Seaboard securities were destroyed on an invalidated guess. All valuations based on estimates of future earnings are bound to be guesses in the sense of reaching into the future. That is a reason against, not for, turning guesswork into dogma and a reason for correcting bad guesses as much as is reasonably practical by hindsight. In view of the impressive demonstration afforded by the Seaboard as to the frailty of pretentious guessing which causes ruthless, however unintended, destruction of property, perhaps District Courts should today be far more reluctant to sanction destruction of massive proportions of securities on the basis of such illusory estimates.

For what the Seaboard situation proves is not the mischance of a mere guess. It calls into question the whole process of dealing with this problem. The estimates that have been so vastly negatived by the event were the product of four years of intensive study by a Special Master, qualified as a specialist in railroad affairs, with special knowledge of the Seaboard, estimates confirmed by a vast

judicial apparatus. And the Seaboard is not an isolated case. In other railroad cases post-prediction earnings over a substantial period are far above the estimates on which extinction was decreed against junior securities. Indeed, the records of these railroad reorganizations at the hands of the Interstate Commerce Commission and special masters and courts have inevitably aroused deep scepticism as to expertise in this field, or, at least, as to reliance in decreeing drastic forfeitures on the basis of it. It is not to be wondered that both the Executive and the Congress have recorded dissatisfaction with the heavy incidence of forfeiture decreed by courts, not by virtue of specific authorization but as a matter of judicial administration.