Kevin Winston OSBORN,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 90–178.

Supreme Court of Wyoming.

Feb. 8, 1991.

Fred R. Dollison, Sheridan, for appellant.

Joseph B. Meyer, Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., and Richard E. Dixon, Asst. Atty. Gen., for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

URBIGKIT, Chief Justice.

In 1982, Kevin Winston Osborn and his companions became the architects of a nightmare. The nightmare began in Uinta County and cost an innocent life. That nightmare spread into Sweetwater County, costing a woman her life and subjecting her son to severe injuries and a lifetime of horrible memories.

Osborn pled guilty to the Sweetwater County charges and to the Uinta County charge. He was given two life sentences for the Sweetwater County crimes and sentenced to die for the Uinta County crime. The Uinta County sentence was reversed and he repled guilty in return for a life sentence. He now challenges the Sweetwater County sentences by arguing that his plea of guilty entered in the middle of his trial had been coerced.

We affirm in finding that the plea was both knowingly made and voluntary and that the sentence was appropriate and within statutory and constitutional perspective under the Wyoming and United States Constitutions.

## I.

## HISTORY OF THESE PROCEEDINGS AND GENERAL FACTUAL BACKGROUND

This saga of crime and criminal procedures has involved three separate pleas of guilty to first degree murder and has occupied the time of both state and federal courts for eight years, once including a death penalty. A more explicit and detailed discussion of the events, intervening judgments and criminal proceedings can be found in *State v. Osborn*, No. 31–91 (Wyo. April 5, 1989) (Judgment and Sentence); *Osborn v. Shillinger*, No. C89–0073J (D.Wyo. October 4, 1989); *Osborn v. Shillinger*, 861 F.2d 612 (10th Cir.1988), *aff'd* 639 F.Supp. 610 (D.Wyo.1986); *Osborn v. Shillinger*, 705 P.2d 1246 (Wyo.1985); and *Osborn v. State*, 672 P.2d 777 (Wyo.1983), *cert. denied* 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984).[1]

Osborn, in 1982, became an escapee from a fifteen year sentence in an Alabama state penitentiary. Osborn ultimately traveled west and was joined by Willard Teel, Terry Green, and an eighteen-year old lady, Ellen Hopkins. The party turned east and arrived in Evanston, Wyoming on May 14, 1982, where they robbed and fatally beat Jimmy Ray O'Briant in his motel room by hitting him in the head with a cowboy boot. Still traveling east the next day, the party of four encountered Dale Moore with a stopped vehicle. With extraordinary cruelty and brutality, the party raped and murdered Moore's mother, Audrey Ditmars, and attempted to kill Moore by multiple stabbings. Moore was left for dead on the prairie. Moore survived to reach help, summon law officers and testify at each stage of the criminal proceedings. The four participants were arrested about 175 miles east of the scene of the second crime by alerted law enforcement forces.

Charges were filed for the murder of O'Briant in Evanston, Uinta County, Wyo-

1. On December 13, 1989, the United States District Court, District of Wyoming, entered an order requiring the state court to permit withdrawal of the guilty plea to murder and attempted murder in this case and granting a new trial. Venue was changed from Sweetwater County to Converse County and the case assigned to the Honorable William A. Taylor, an experienced trial judge who had previously handled death penalty cases, including an earlier plea by Osborn resulting in a life sentence from which appeal was not taken. The case was convened for retrial after extensive motion practices and one comprehensive oral argument hearing on May 24, 1990. Trial began June 11, 1990, and on the third day of the trial, Osborn withdrew his innocent plea, entered into a plea bargain and was then given two life sentences. An appeal was filed June 21, 1990. On June 26, 1990, new appellate counsel was appointed for representation during the appeal. The record was filed in the Wyoming Supreme Court on July 19, 1990. After one extension, Osborn's brief was filed with the Wyoming Supreme Court on September 17, 1990, and the State's brief, with one extension, was filed on November 19, 1990. Oral argument was scheduled and held December 6, 1990, and the case was assigned for opinion on December 7, 1990.

ming and for the Ditmars homicide and Moore attempted homicide in Sweetwater County, after which the two criminal complaints were consolidated for arraignment in Sweetwater County.

Hopkins pled guilty to aiding and abetting the aggravated robbery of Moore in Sweetwater County and conspiracy to commit aggravated robbery and aggravated robbery of O'Briant in Uinta County. Hopkins received a concurrent sentence of four to ten years and five to ten years with one year suspended. Teel arranged a plea bargain, but was strangled to death by his co-defendant, Green, in their jail cell in Sweetwater County before the plea could be entered. Green pled guilty to the Sweetwater County charges of first degree murder of Ditmars by strangulation, attempted first degree murder of Moore by stabbing, first degree murder of co-defendant Teel by strangulation, aggravated robbery of Moore, first degree sexual assault of Ditmars, and attempted second degree murder of O'Briant, a Uinta County charge. For these offenses, Green received four consecutive life sentences for the two murders and the two attempted murders and two consecutive sentences of 45 to 50 years for the aggravated robbery and rape charges. After co-defendants Green and Hopkins were sentenced, O'Briant, the victim in Uinta County who had been beaten on the head with his own boot, died.

On August 23, 1982, Osborn was charged in Sweetwater County with aiding and abetting the first degree murder of Ditmars and the attempted first degree murder and aggravated robbery of Moore. Uinta County charged Osborn with conspiracy to commit aggravated robbery, aggravated robbery and felony murder of O'Briant. Osborn waived his rights to preliminary hearings in both counties and waived his right to venue in Uinta County on the Uinta County charges. *Osborn*, 672 P.2d 777. In the first criminal prosecution, Osborn initially pled guilty to the Sweetwater County charges and to the Uinta County

offense. After a two day sentencing hearing, Osborn was sentenced to death for the first degree felony murder of O'Briant.[2]

An appeal was taken to this court in *Osborn*, 672 P.2d 777, where the death sentence was affirmed and error in denial of the right to withdraw the guilty plea rejected. A second attempt in 1985 through habeas corpus to reverse the death penalty also failed on denial of a motion for a stay of execution. *Osborn*, 705 P.2d 1246. No state court appeal was taken from the plea and life sentence entered for the Sweetwater County murder of Ditmars.

Upon subsequent proceedings, the Uinta County death penalty was reversed by the United States District Court for the District of Wyoming on a federal habeas corpus proceeding for error in denial of leave to withdraw guilty plea. *Osborn*, 639 F.Supp. 610. This decision was affirmed by the Tenth Circuit Court of Appeals in the 1988 decision of *Osborn*, 861 F.2d 612. The O'Briant murder and robbery offenses after federal court reversal were then rescheduled for state court trial before Judge William A. Taylor in Converse County. In a plea bargain to escape exposure to the death penalty, Osborn again pled guilty to murder and robbery. Judgment and sentence was entered on April 5, 1989, for which Osborn received sentences of 45 to 50 years—conspiracy to commit aggravated robbery; 45 to 50 years—aggravated robbery; and a life sentence for first degree murder with the sentences to be concurrent and concurrent to the sentences previously entered for the Sweetwater County offenses involving the murder of Ditmars and attempted murder of Moore.

Following his first guilty plea for the O'Briant homicide, Osborn had consecutive sentences of two life terms and a consecutive sentence of 45 to 50 years for the Sweetwater County charges, plus the death sentence and two concurrent sentences of 45 to 50 years for the Uinta County charges which were consecutive to the

---

**2.** The guilty plea to the Sweetwater County homicide of Ditmars, when first entered, was used as an aggravating circumstance for the felony murder death penalty hearing of the O'Briant killing.

Sweetwater County sentences. The Sweetwater County sentences were 45 to 50 years for aggravated robbery, life for murder in the first degree, and life for the attempted first degree murder, each to be served consecutively. After resentencing in 1989 on the Uinta County offense following the guilty plea, the posture of Osborn was singularly improved at least in numbers since he then had essentially only two life sentences.

Osborn, with reversal of the Uinta County death penalty and the death penalty repleaded to a life sentence, then became dissatisfied with his guilty plea to the Sweetwater County charges from which no appeal had ever been taken in the state court system. Through further federal court habeas corpus proceedings, Osborn brought the Sweetwater County proceedings back to retrial in June 1990 and again pled guilty. After all of this, Osborn has a life and concurrent 45 to 50 year Uinta County sentence and two consecutive life Sweetwater County sentences to be served consecutive to the Uinta County term—so, give or take some numbered terms, he now has three consecutive life sentences which are essentially the same total as the sentences, except for the death penalty, that he had before he was granted the right to replead on all charges and before he again pled guilty to all offenses.

Osborn now worries that by obtaining a retrial on the Ditmars and Moore offenses with death penalty exposure and resulting plea, he has acquired an increase from two life sentences to three life sentences which demonstrates vindictive prosecution or vindictive sentences. We do not accept that conclusion. In Wyoming, a life sentence, subject only to commutation by the governor, is a life sentence. Osborn can expect to spend the rest of his life in Wyoming penal confinement for the life sentence which he received for the Uinta County murder of O'Briant entered in Converse County on April 5, 1989, from which no appeal has been taken. *Weldon v. State,* 800 P.2d 513 (Wyo.1990).[3]

The present record presents references and details of the plea entered into in 1982 for the Uinta County O'Briant murder and the complete details of the Sweetwater County proceedings since first information was filed June 22, 1982. Within that record for this appeal, we have an acknowledged statement of guilt signed August 23, 1982, sworn testimony of guilt provided in open court August 23, 1982, and then after three days of trial in June 1990, Osborn again pled guilty to aiding and abetting murder and an actual attempted murder and robbery.

Those facts and legal proceedings bring the sentence of June 1990 back to us for appellate review. One of the most skillful criminal attorneys in Wyoming had been appointed to represent Osborn in the Converse County trial and one of the most thorough and competent appellate lawyers now presents this appeal. We are convinced that excellent assistance has been furnished and due process provided in this last trip to the bar of justice from which this present appeal is pursued. Conference, *Gideon v. Wainright Revisited: What Does the Right to Counsel Guarantee Today?,* 10 Pace L.Rev. 327 (1990).

## II.

## ISSUES ON APPEAL

Osborn's stated issues include:

---

3. It is questionable whether this present appeal actually presents viable issues relating to the life sentence given for the Sweetwater County attempted murder of Moore during the criminal episode. Inquiry to counsel at oral argument and examination of the brief do not reveal any factual or legal challenge to the life sentence for attempted murder. As it was before, the life sentence is consecutive to the punishment for the murder of Ditmars. Consequently, we seem to have inquiry directed to the second of the three consecutive life sentences as a subject for appeal. The concurrent sentencing doctrine may not have validity but its thesis does have some appeal as considering practical facts and actual results where no matter what is said or done in this appeal, Osborn will most likely spend the rest of his natural life in penitentiary confinement. *Lauthern v. State,* 769 P.2d 350 (Wyo.1989) (Urbigkit, J., dissenting); *Driskill v. State,* 761 P.2d 980 (Wyo.1988); Emanuel, *The Concurrent Sentence Doctrine Dies a Quiet Death—Or Are the Reports Greatly Exaggerated?,* 16 Fla.St.U.L.Rev. 269 (1988).

1. Vindictive sentence.

The sentence imposed upon appellant by the trial court was a vindictive sentence and, as such, violates appellant's protections against double jeopardy and his rights to due process of law.

2. Improper acceptance of the June 13, 1990, guilty plea.

The district court committed reversible error in accepting appellant's guilty plea in light of the fact that appellant told the district court that appellant had been coerced into making the plea.

3. Ineffective assistance of trial counsel.

Whether appellant received ineffective assistance of counsel at the trial level.

A. Should trial counsel have pursued an interlocutory appeal (writ of certiorari) on the question of imposition of the death penalty to the re-filed charges?

B. Should counsel have called witnesses requested by appellant?

C. Should appellant's guilty plea be withdrawn on the basis of ineffective assistance of counsel?

The State rephrases:

I. In accepting the plea agreement and entering a guilty plea, did appellant admit his crimes, waive non-jurisdictional defenses, and sacrifice his right to appeal denial of pretrial defenses?

II. Were potential death penalty issues mooted by appellant's lack of standing to complain in light of the absence of prejudice?

III. Does the presumption of prejudice arise when subsequent sentences are diminished from earlier counterparts?

IV. Did trial counsel win the best possible outcome for appellant in a fashion which was both professional and exemplary?

4. In addition to reading and analysis of the *complete* record now presented, we have also reviewed briefs filed in the two earlier appeals: *Osborn*, 705 P.2d 1246 and *Osborn*, 672 P.2d 777. The record includes the complete trial transcript in both criminal dockets in Sweetwater and Uinta counties, consolidated in Sweetwater

## III.

## PROPORTIONALITY—WHO WAS THE WORST AMONG THE MURDERERS?

Before this court addresses the issues directly presented, a thread consistently found in Osborn's posture deserves comment. Osborn denies that he was "the ringleader." He contends that status should be reserved for Green who apparently strangled Ditmars after the rape and then strangled Teel in the jail in Green River, Wyoming. Almost preclusively, including specific admissions, the record shows that Osborn caused the death of O'Briant, who was tied up and helpless, from head injuries caused by blows to the head using the victim's own cowboy boot.

We fail to find either an anticipated defense or real difference as to who may have been the worst among these bad people since with plea and no death penalty exposure remaining, Osborn's guilt for a life sentence is relatively unchallenged. His finger pointing towards Green could have been significant in any jury decision on the death penalty, but nominally none in co-acting in the stabbing and attempted murder of Moore and aiding and abetting the rape and killing of Ditmars for which life sentences resulted. From the standpoint of factual sufficiency to justify the sentences under these circumstances, we find no difference whether the leader in horror was either Green, Osborn, or both, or whether they equally contributed in inciting the resulting homicide crimes. See the factual analysis of this court in *Osborn*, 672 P.2d 777.[4]

## IV.

## ISSUES PRESENTED

*A.—Issue 1. Vindictive Sentence*

The sentence imposed upon appellant by the trial court was a vindictive sentence

County on October 13 and 14, 1982. Except in our effort to expedite disposition of this appeal, *cf.* W.S. 6–2–103(a), this case is considered within the present proper perspective of a multiple murder life sentence criminal case where involvement and participation of Osborn is not in any issue.

and, as such, violates appellant's protections against double jeopardy and his rights to due process of law.

■ In reversal and remand of the guilty plea from the Uinta County death penalty offenses, Osborn obviously improved his position by elimination of the death penalty and acquisition of concurrent sentencing. However, what benefit Osborn realistically hoped to achieve by these present proceedings regarding the Sweetwater County crimes is hard to extract from the record.

Osborn's plea bargain for the life sentence on the Ditmars murder was gone. Now, however, the Sweetwater County sentencing would follow Uinta County rather than, as existed in 1983, precede the death penalty which came first from Uinta County. We analyze the status with federal court reversal and direction to permit withdrawal of the guilty plea that the slate was wiped clean so that Osborn could defend all charges and the State could pursue conviction on whatever crimes and penalties the evidence might sustain. *Simonds v. State*, 799 P.2d 1210, 1218 (Wyo.1990), Macy, Justice, specially concurring (quoting *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)); *Ex parte Fortune*, 797 S.W.2d 929 (Tex.Cr.App. 1990). Death penalty exposure should not have been unexpected. We find no prosecutorial vindictiveness where now on retrial, after one offense from the crime scenario is pleaded out to a life sentence, the prosecutor in the adjoining county elected to retain death penalty exposure for the second sequence where now the prior murder plea of guilty provides a basis for statutory aggravation under either past or present Wyoming first degree murder enactments.[5] Prosecutorial discretion does

not disappear after defendant's withdrawal from an initial plea bargain. *Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989); *United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982); *State v. Knox*, 95 N.C. App. 699, 383 S.E.2d 698 (1989).

This factual record is not helpful to Osborn. The trial judge entered the sentence on the O'Briant murder pursuant to the plea bargain made. Osborn, having gained that benefit, sought retrial on the Ditmars killing and the intrinsic horror of events and the senselessness of conduct was forcefully spread on the record from the testimony of Moore through his verbal description for sixty-five pages of trial transcript. That vivid description provided ample justification for consecutive sentencing for one killing and an effort to commit another. After that testimony had been given, Osborn was faced with a real dilemma—try to make a deal and save his life or continue the trial with the extreme risk of a death penalty imposition resulting from the practically undenied aggravating factors of rape, robbery and a prior senseless murder. The benefit in dealing was avoidance of the death penalty; the detriment could be consecutive sentencing for life terms which, under Wyoming law, has a practical factor of de minimis.[6]

We find the record to provide no sufficient evidence upon which a vindictive sentencing reversal could properly be sustained. *United States v. Austin*, 902 F.2d 743 (9th Cir.), *cert. denied* —— U.S. ——, 111 S.Ct. 200, 112 L.Ed.2d 161 (1990). We have here a trial judge who had not ordered the original sentences on either offense. *Texas v. McCullough*, 475 U.S. 134, 140, 106 S.Ct. 976, 980, 89 L.Ed.2d 104

**5.** This is an exact reversal of the 1982–83 status where the first murder plea in the Sweetwater County case was used for aggravation in death penalty consideration of the Uinta County homicide. Here, with the Uinta County offenses first determined, that plea remained available for aggravation as an element in the subsequent Sweetwater County criminal death penalty prosecution.

**6.** What Osborn should recognize is that what we do here has absolutely no affect on whether he will ever be released one day short of death

from Wyoming penitentiary confinement. His future is irretrievably invested in the Wyoming constitutional authority of the governor to commute a sentence. Whether we might approve consecutive sentences, or even require concurrent sentences, would have a very unlikely affect on the recognition of that elected official of the events and circumstances surrounding the multiple homicides and associated violent crimes. An actual life sentence in confinement was earned.

(1986). The trial judge was informed by the record of the first sentencing and live trial testimony on the second occasion of the plea entry. The offenses portrayed justify the sentences given which are, in reality, one actual life sentence. Recognizing the consecutive horror of the continued criminal events in assessment of responsibility for each phase does not constitute either prosecutorial or judicial vindictiveness in effectuation of the consecutive sentences. *McCullough*, 475 U.S. at 134, 106 S.Ct. at 976; *Huffman v. State*, 543 N.E.2d 360 (Ind.1989), *cert. denied* — U.S. —, 110 S.Ct. 3257, 111 L.Ed.2d 767 (1990).

We have considered the valid constitutional interest addressed by the United States Supreme Court in *Pearce*, 395 U.S. 711, 89 S.Ct. 2072, and find here neither impermissible motivation nor vindictive intention to punish for taking the appeal.

When a sentence imposed after trial is more severe than that previously applied after a guilty plea, the specific issue of whether the *Pearce* prescription applied against the vindictiveness was specifically considered and explicitly settled in *Smith*, 109 S.Ct. 2201.[7]

Application of vindictiveness to increase the penalty to death upon re-prosecution was also rejected as a presumptive error in *Sorola v. State*, 769 S.W.2d 920 (Tex.Cr.

App.), *cert. denied* — U.S. —, 110 S.Ct. 569, 107 L.Ed.2d 563 (1989). Certainly, acquittal on the merits of the double jeopardy concept of *Arizona v. Rumsey*, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984) and *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) will not apply in this case where the guilty plea was reversed for retrial. The cases cited by Osborn, *State v. Washington*, 380 So.2d 64 (La.1980) and *State ex rel. Patterson v. Randall*, 637 S.W.2d 16 (Mo.1982), do not involve second conviction after the initially withdrawn guilty plea. In reality, within this case, we cannot escape the axiom that for criminal punishment no person has more than one lifetime to sustain retribution for his crimes.

### B.—Issue 2. Improper Acceptance of the Guilty Plea

The district court committed reversible error in accepting appellant's guilty plea in light of the fact that appellant told the district court that appellant had been coerced into making the plea.

■ In simple terms, after once pleading guilty and having that plea withdrawn, Osborn at mid-trial again pled guilty to the Sweetwater County criminal offenses in

---

7. *Smith*, 109 S.Ct. at 2205–06 (footnote omitted) states:

> [I]n *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) we held that no presumption of vindictiveness arose when a second jury, on retrial following a successful appeal, imposed a higher sentence than a prior jury. We thought that a second jury was unlikely to have a "personal stake" in the prior conviction or to be "sensitive to the institutional interests that might occasion higher sentences." *Id.*, at 26–28, 93 S.Ct., at 1982–1983.
>
> We think the same reasoning leads to the conclusion that when a greater penalty is imposed after trial than was imposed after a prior guilty plea, the increase in sentence is not more likely than not attributable to the vindictiveness on the part of the sentencing judge. Even when the same judge imposes both sentences, the relevant sentencing information available to the judge after the plea will usually be considerably less than that available after a trial. A guilty plea must be both "voluntary" and "intelligent," *Boykin v.*

Alabama, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969), because it "is the defendant's admission in open court that he committed the acts charged in the indictment." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970). But the sort of information which satisfies this requirement will usually be far less than that brought out in a full trial on the merits.

As this case demonstrates, *supra*, at 2203–2204, in the course of the proof at trial the judge may gather a fuller appreciation of the nature and extent of the crimes charged. The defendant's conduct during trial may give the judge insights into his moral character and suitability for rehabilitation. *Supra*, at 2203. See *United States v. Grayson*, 438 U.S. 41, 53, 98 S.Ct. 2610, 2617, 57 L.Ed.2d 582 (1978) (sentencing authority's perception of the truthfulness of a defendant testifying on his own behalf may be considered in sentencing). Finally, after trial, the factors that may have indicated leniency as consideration for the guilty plea are no longer present.

the morning [8] and then, in the afternoon, stated that he was coerced and wished to

8. The principal witness survivor, Moore, had then testified, but Osborn additionally stated in open court with entry of his guilty plea:

THE COURT: Mr. Osborn, are you ready to plead?

THE DEFENDANT: I would like to see if we can get the agreement—

THE COURT: I will come to that. I'm not asking you to plead. Are you ready to plead?

THE DEFENDANT: Yes, sir.

THE COURT: Have you been forced or threatened by anyone to plead one way or another?

THE DEFENDANT: No, sir.

THE COURT: Is your plea voluntary and not the result of any threats or promises except any which may have resulted from a plea agreement?

THE DEFENDANT: No, sir.

THE COURT: Your plea is not voluntary? Is your plea voluntary except for any plea agreement?

THE DEFENDANT: Yes.

THE COURT: Are you now—for—are you making your plea after talking to Mr. [Defense Counsel] about this?

THE DEFENDANT: Yes, sir.

THE COURT: Very well, now if you plead guilty do you understand that the Court will ask you questions about the offense which you will answer under oath on the record in the presence of your attorney and that those answers may be used against you in this case or any prosecution for perjury or false statement?

THE DEFENDANT: Yes, sir.

THE COURT: Plea bargaining and sentence agreement between your attorney and the state is permissible but it is not binding upon the Court and the Court may reject that agreement; do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Has there been any plea agreement?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. [Defense Counsel], would you like to explain it to the Court?

MR. [Defense Counsel]: Yes, Your Honor. Pursuant to discussion between myself and Mr. Osborn with Mr. [Prosecuting Counsel] this morning, we will jointly recommend to the Court that the Court accept a plea of guilty to all three of these charges in return for which the state has offered to produce no evidence of aggravating circumstances, thereby precluding the imposition of a death sentence on count one. There is no agreement as to whether the time will be concurrent or consecutive.

THE COURT: Is that—first of all, Mr. Osborn, is that your understanding?

THE DEFENDANT: No, there was one stipulation to that agreement as well, that I will do my time in the State of Wyoming.

THE COURT: That you will not do your time in the State of Wyoming?

THE DEFENDANT: That I will do my time in the State of Wyoming. This is one of the agreements that Mr. [Prosecuting Counsel] and I discussed this morning personally.

THE COURT: Mr. [Prosecuting Counsel], is that your understanding of the agreement?

MR. [Prosecuting Counsel]: Your Honor, Mr. Osborn requested that of me. When I came back and told him in the event that the Court accepted a plea of guilty to these charges—only in the event that the Court accepted his guilty plea, then and only then would I agree not to introduce aggravating circumstances.

He did request that he have the time in Wyoming. I am not now nor have I ever been—I don't know if I can make a promise like that, certainly I don't know if I can keep it.

The only agreement that I have made with counsel to Mr. Osborn is that if he enters a plea of guilty to these charges and if he makes a sufficient foundation that the Court will accept those pleas, then and in that event, the state will not introduce aggravating circumstances.

MR. [Defense Counsel]: I didn't mean to short change what Mr. [Prosecuting Counsel] was saying about the factual basis in my recitation.

THE COURT: Counsel, let me say this: I am not either going to reject or accept that agreement until I have heard whether there is a factual basis for the charges.

And as to the portion, Mr. Osborn, of your request to this Court that you serve your time in Wyoming, I will make that request to the warden, but I, as with Mr. [Prosecuting Counsel], have no control over Mr. Shillinger, but I will make that request if I accept your plea and if you establish a factual basis.

Very well, then, Mr. Osborn, will you and your counsel please stand at the lectern?

Kevin Winston Osborn, how do you plead to the charge of unlawfully, feloniously or with premeditated malice—feloniously and purposely kill [sic] Audrey Ditmars, a human being, by strangulation in a U–Haul truck on or about May 15th, 1982, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Mr. Osborn, how do you plead to the charge of unlawfully and feloniously attempting to kill a human being, to wit: Dale Moore, on or about the 15th day of May, 1982 at or near Point of Rocks, Wyoming, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Mr. Osborn, how do you plead to the charge of unlawfully and feloniously taking from one Dale Moore property of value, to wit: a wallet containing approximately $600 in United States currency, $100 in Canadian currency, a Seiko digital watch and Master Card, by hitting him, tying his hands, exhibiting knives and using said knives

withdraw the morning's plea. The argument which he made was essentially the ringleader excuse—someone else in the case, e.g. Green, was the killer. The fact that Green was the killer of Ditmars seems accurate within this record, but did not necessarily save Osborn, admitted participant and aider and abetter, from death penalty exposure under Wyoming law. *Hopkinson v. State*, 664 P.2d 43 (Wyo.), *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). *See Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127, *reh'g denied* 482 U.S. 921, 107 S.Ct. 3201, 96 L.Ed.2d 688 (1987); and Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death*, 31 B.C.L. Rev. 1103 (1990). We find nothing in the record to provide evidence of ineffectiveness of trial counsel resulting in the morn-

in the commission of the offense entitled aggravated robbery, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Mr. Osborn, before I can accept your guilty plea on these three charges, I must be sure that you're pleading knowingly and intelligently and that you understand what it is you're pleading guilty to. The only way I can find out about that is for you to tell me about it under oath. So I want you to raise your right hand, sir.

(Defendant duly sworn).

THE COURT: Mr. Osborn, on May 15th, 1982 what happened relative to the death—your participation in the death of one Audrey Ditmars? Please tell me.

THE DEFENDANT: I don't understand what you're asking. You're asking did I participate in the killing? No, I did not. I was driving the vehicle. The murder happened in the back of the truck. It's alleged that I encouraged this murder, I did encourage it.

THE COURT: You did?

THE DEFENDANT: Yes, sir, so I am guilty of aiding and abetting murder in the first degree.

THE COURT: The other participants in the murder were Mr. Green?

THE DEFENDANT: Yes, sir.

MR. [Defense Counsel]: And Mr. Teel.

THE COURT: Mr. Teel; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Were you aware and—Mr. Osborn, at that time that Mr. Moore was still alive?

THE DEFENDANT: Yes, sir.

THE COURT: And that—did you encourage or aid and abet in the killing of Audrey Ditmars and the attempted killing of Dale Moore by saying that you could leave no witnesses in this particular crime?

THE DEFENDANT: Yes, sir.

THE COURT: How do you plead, Mr. Osborn, to the attempted first degree murder of one Dale Moore on or about the 15th of May, 1982, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Can you tell me what your participation was in the attempted murder of Dale Moore?

THE DEFENDANT: I chased him down and stabbed him.

THE COURT: You chased him down and stabbed him?

THE DEFENDANT: Yes, sir.

THE COURT: Then after doing that, did you attempt to hide your crime by throwing brush and material over Mr. Moore's body?

THE DEFENDANT: Yes, sir.

THE COURT: Finally, Mr. Osborn, how do you plead to the charge of aggravated robbery of one Dale Moore by removing from his person 600—approximately $600 in cash, $100 in Canadian currency, a Seiko watch and a Master Card?

THE DEFENDANT: Guilty.

THE COURT: Did you take those items from Mr. Moore?

THE DEFENDANT: Yes.

THE COURT: And did you take them from him as he related on the stand, by threatening him with a knife and later stabbing him?

THE DEFENDANT: Yes.

THE COURT: Mr. [Prosecuting Counsel], would you have anything else to add?

MR. [Prosecuting Counsel]: I would add, Your Honor, or move to offer as part of this sentencing proceeding the testimony that Kevin Osborn gave in his habeas corpus proceeding in 1985 as well as the entire transcript of the trial proceedings that have occurred beginning 9:00 Monday morning and continuing through the present time in this particular proceeding and ask that they be received as part of the sentencing proceeding. Other than that, I have nothing further.

THE COURT: I—

MR. [Defense Counsel]: I have no objection, Your Honor.

THE COURT: Thank you, Mr. [Defense Counsel]. All of those items are made a part of this record together with the record itself.

The Court finds that the defendant is alert. He is not under the influence of alcohol or drugs, nor is he suffering from any mental defect which could affect his ability to understand these proceedings and he is competent to enter a plea of guilty. The plea is knowingly and voluntarily made after consultation with competent counsel, without any improper inducement or conditions and with an understanding of the charges and direct consequences. There is a factual basis for the guilty plea which the Court accepts in accordance with the plea agreement.

I accept the agreement.

ing plea bargain. There was no abuse of discretion by the trial court in rejection of the request to withdraw the plea. *United States v. Loughery,* 908 F.2d 1014 (D.C.Cir. 1990); *United States v. Alvarez–Quiroga,* 901 F.2d 1433 (7th Cir.), *cert. denied* — U.S. ——, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990); J. Bond, *Plea Bargaining & Guilty Pleas* § 7.3(c) (1983). This analysis resolves the appellate issue.

Osborn has a misconception that his admitted participation without being the actual killer absolutely removes death penalty exposure in order that justification for the first degree murder conviction based on the aiding and abetting participation left him safely removed from the ultimate penalty. *See Haight v. State,* 654 P.2d 1232 (Wyo. 1982); *Hopkinson v. State,* 632 P.2d 79 (Wyo.1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Hawkes v. State,* 626 P.2d 1041 (Wyo.1981); and *Goldsmith v. Cheney,* 447 F.2d 624 (10th Cir.1971). Lack of a requirement to personally commit the hands-on (strangulation) homicidal act as a basis for death penalty exposure had been resolved for Wyoming homicides by *Hopkinson,* 632 P.2d 79.

The State postulates its responsive argument to this guilty plea issue by assertion of waiver of non-jurisdictional defenses. *Sword v. State,* 746 P.2d 423 (Wyo.1987); *Armijo v. State,* 678 P.2d 864 (Wyo.1984). We need not pursue whether guilty plea waiver or forfeiture was a reasonable decision bargained by Osborn to escape a potential death penalty in order to analyze the case. *Tison,* 481 U.S. 137, 107 S.Ct. 1676. There was no unconstitutional coercion. Osborn gave up little, if anything, where even acquittal on the Ditmars murder would mean almost nothing. Exposure to a death penalty from an admitted heinous crime did exist where Osborn started and continued to be a principal actor and a willing participant. *Woods v. State,* 775 S.W.2d 552 (Mo.App.1989).

We reject the coerced plea argument as both factually unsustained and pragmatically illogical. Osborn received the benefits desired by removal of exposure to a death penalty for the offenses he committed. *People v. Green,* 146 A.D.2d 281, 540 N.Y.S.2d 95 (1989), *aff'd,* 75 N.Y.2d 902, 554 N.Y.S.2d 821, 553 N.E.2d 1331, *cert. denied* — U.S. ——, 111 S.Ct. 165, 112 L.Ed.2d 130 (1990). To a significant extent, the argument of Osborn is in first stead misdirected and in second concept hypothetical. Within the totality of the factual record, little doubt exists about what occurred, except as to who was "the ringleader," which we determine to be unimportant considering *the sentences now presented resulted from a plea bargain on murder offenses.* The totality of the sentences is not unduly harsh considering what happened.

Osborn then asks us to determine his risk for a death penalty imposition. We consider that issue hypothetical and decline to determine what this court would have done after review of a succeeding appeal if the Converse County jury had found a basis for death penalty imposition. What we do establish in this decision is that the bargained plea was not inappropriate nor improperly coerced and consequently the discretion of the trial court to reject withdrawal was not improvidently exercised. *Zanetti v. State,* 783 P.2d 134 (Wyo.1989); *Chorniak v. State,* 715 P.2d 1162 (Wyo. 1986).

### C.—Issue 3. Ineffectiveness of Trial Counsel

Whether appellant received ineffective assistance of counsel at the trial level.

A. Should trial counsel have pursued an interlocutory appeal (writ of certiorari) on the question of imposition of the death penalty to the re-filed charges?

B. Should counsel have called witnesses requested by appellant?

C. Should appellant's guilty plea be withdrawn on the basis of ineffective assistance of counsel?

■ With one of the most difficult clients to represent and one of the most able criminal lawyers in defense, we are presented with the real appellate issue addressing adequacy of representation during the time before Osborn determined to have

the cards recut and lower the risk mid-trial by a guilty plea to a bargained beneficial sentence.[9] The level of legal responsibility

9. In the interest of extreme caution and evidencing singular perception and experience, counsel for Osborn presented his client to the court reporter *before the trial commenced* to discuss dissatisfaction and strategy in camera in the presence of only the reporter, defense counsel and Osborn. That exchange included:

MR. [Defense Counsel]: Kevin, I told you several days ago that because you and I had some disagreements about some of the things—some of the ways decisions have been made and that I'm making that you and I disagree about, that I thought you ought to have an opportunity to put those on the record, that is fine. If you just want to do that in front of Mr. McKee, the court reporter, have him make that record and Mr. McKee will not discuss that with anyone else and at the end of the trial when a transcript is typed, your objections or your disagreements with me will go in the record. Why don't you go ahead and talk about the things you disagree with me about in terms of handling the case.

Understand this is not an opportunity to say I disagree with the judge's rulings. The judge's rulings are what they are and as to the ones about which things can't be done, if things don't work out, there would be an appeal. But as to what I'm doing, tell Mr. McKee.

THE DEFENDANT: First of all, I'm not an attorney, therefore I'm not qualified to say what Mr. [Defense Counsel] is doing or not doing. I did as Mr. [Defense Counsel]—the only thing I requested was my defense to be conducted pursuant to the American Bar Association with reference to defense counsel and criminal justice. I have asked Mr. [Defense Counsel] to do a couple of things for me. Whether they're right or wrong, I don't know. I just wanted to make sure they're on the record.

First of all, when the judge made his rulings, I wished to have an intralocutory [sic] appeal filed to the Supreme Court.

MR. [Defense Counsel]: Do you mean an interlocutory appeal?

THE DEFENDANT: Yes. [Defense counsel] felt this wasn't a proper time to do it due to the fact that the Wyoming Supreme Court is going to hear the case as soon as this is over anyway. They're automatically appealed.

There are several witnesses I wanted to—we can't discuss the case in here, can we?

MR. [Defense Counsel]: Sure we can, unless you don't want to. What I'm saying, this is your opportunity to tell Mr. McKee—tell Mr. McKee and the Supreme Court, and any other Court that may look at this case in the future, anything about any disagreements that you and I may have. As a matter of fact, just so you know, if there is something that you don't want to say in front of me, or whatever, I would be—I'll step outside. Whatever you're comfortable with.

THE DEFENDANT: One of the things, I feel the state is going to try to paint a picture of me as being the ring leader, the bad guy—

MR. [Defense Counsel]: For the purposes of what we are doing today, what you may want to do is say these are the things I asked [defense counsel] to do and these are the things that he says he won't do and these—this is why I want him to do it.

THE DEFENDANT: I wanted Dr. Brian Miracle subpoenaed to court, Linda Miller, Wyatt Skaggs, Keith Goody. Keith Goody represented Terry Green. He can testify as to his character. Wyatt Skaggs was the attorney of Willard Teel. He could also elaborate on Terry Green's character. Also Wyatt Skaggs, it's in records now where he indicated that Green killed Teel because of the fact that Teel was going to roll over on him, he killed him in the county jail. All of this is in record and I wanted this brought out.

MR. [Defense Counsel]: You also asked me to call as a witness a pathologist and hematologist.

THE DEFENDANT: You explained that to me.

MR. [Defense Counsel]: Are you comfortable with that decision?

THE DEFENDANT: Yes. And Dr. Miracle examined Terry Green so he could indicate his character.

And as [defense counsel] and I discussed yesterday, I am being sentenced on the Sweetwater again and we are getting double jeopardy—

MR. [Defense Counsel]: Kevin, is this part—something you have a disagreement with the judge about or me about?

THE DEFENDANT: The whole system.

MR. [Defense Counsel]: The purpose of what we are doing this morning is to give you an opportunity to talk about the things you and I disagree about and that I haven't done that you wanted me to do. Obviously we—you know, like on the double jeopardy business and things that the judge has yet to rule on, we will probably give you another opportunity to do what we are doing this morning at the end of the trial and while the jury is out.

All the disagreements you have with the judge or with, as you say, the system, you're welcome to put on the record at that time.

Is there anything else about my representation, the decisions I made, that kind of thing or your relationship with me that you think ought to be in the record so that a reviewing Court can see it and hear your own words?

THE DEFENDANT: I think we have had a good rapport together. Like I say, I'm no attorney and if I was, I wouldn't need you, I would be representing myself, right?

Green had been brought to Converse County for the trial by Osborn's subpoena. Teel was

for appointed counsel has limits in reasonableness. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh'g denied* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984).

In first argument, we are presented the contention that ineffectiveness flows from defense counsel's failure to follow the trial court's pre-hearing decision to permit death penalty exposure by a writ of certiorari to this court. Initially, opportunity to obtain consideration was at best problematical. *See Roach v. State*, 801 P.2d 1037 (Wyo. 1990), Urbigkit, Justice, dissenting; *Swazo v. State*, 800 P.2d 1152 (Wyo.1990), Urbigkit, Justice, dissenting; *State ex rel. Phillips v. County Court of Sweetwater County*, 779 P.2d 291 (Wyo.1989), Urbigkit, Justice, would have granted writ of prohibition); *State ex rel. Harvey v. County Court of Sweetwater County*, 779 P.2d 291 (Wyo.1989), Urbigkit, Justice, would have granted writ of prohibition; and *Coletti v. State*, 769 P.2d 361 (Wyo.1989). Beyond the difficulty there evidenced, current history as to the present attitude of this court suggests a reluctance to grant certiorari under these circumstances. Finally, the law was not favorable within these basic facts for Osborn to retain the benefit of his prior plea and escape exposure to the death penalty on a retrial decision. *Smith*, 490 U.S. 794, 109 S.Ct. 2201.

■ In second issue, improvidence in legal assistance is suggested in rearguing the "fact" that Green was the "ringleader." Osborn's brief does not inform us who the suggested additional witnesses may have been other than stating as prospective witnesses counsel who had represented the other malefactors which might provide information tending to prove that Green was the worst of the group. At the stage of plea while still in the State's case, we find none of the suggested witnesses whose testimony, if admissible, would by any stretch of the imagination have proved particularly helpful. Certainly, defense counsel was not required to expect that the

Wyoming Supreme Court would reject a felony murder death penalty statutory application with established case law which underlies the invalidity of the basic argument. *Engberg v. State*, 686 P.2d 541 (Wyo.), *cert. denied* 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984); *Hopkinson*, 664 P.2d 43.

We reject the entire argument since only by some considerable stretch of the imagination could those witnesses have been helpful and, if so, only then at the penalty phase when application of the death penalty would have been considered by the jury. We need not resort to the normal rule of attorney discretion in choice of witnesses [10] to reject this argument as the trial events of this case developed. Since Osborn pled guilty to offenses for which the subsequent penalty entered was not only reasonable but expectable, we find no ineffectiveness of legal assistance presented because the disinclination of counsel not to provide witnesses trying to say that another of the violence directed foursome was admittedly a very bad person and a dangerous criminal. True enough, Green was sentenced accordingly with four consecutive life sentences.

The last issue presented as an ineffectiveness contention is that Osborn reserved his right to withdraw his plea for the second time (fourth including the Uinta County offenses) because he was being insufficiently assisted by legal representation. We reject that argument forthwith since neither mighty miracles nor brilliance of exemplary counsel could erase what occurred in western Wyoming in mid-summer 1982 including two killings, one attempted murder, rape and robbery.

We will neither remand the case another time for retrial nor reduce the number of consecutive sentences requested by Osborn. Osborn was provided the start of a fair and well directed trial and then with unfavorable trial evidence having been introduced, he decided to mitigate his risks by entry into a plea bargain. Most likely,

dead and the fourth participant had been released from prison and was long gone.

10. *Campbell v. State*, 728 P.2d 628 (Wyo.1986); *United States v. Balzano*, 916 F.2d 1273 (7th Cir.1990).

Osborn was lucky that both the prosecutor and the trial court accepted that decision. We leave Osborn with the plea and a record which carefully and comprehensively sustains his guilt for the offenses charged.

Osborn correctly points out in briefing that in order for a plea of guilty to be entered freely, voluntarily, intelligently and understandably, the trial court should inform concerning:

(c) *Advice to defendant.*—Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform him of, and determine that he understands, the following:

(1) The nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law; and

(2) If the defendant is not represented by an attorney, that he has the right to be represented by an attorney at every stage of the proceeding against him and, if necessary, one will be appointed to represent him; and

(3) That he has the right to plead not guilty or to persist in that plea if it has already been made, and that he has the right to be tried by a jury and at that trial has the right to the assistance of counsel, the right to confront and cross-examine witnesses against him, and the right not to be compelled to incriminate himself; and

(4) That if he pleads guilty or nolo contendere there will not be a further trial of any kind, so that by pleading guilty or nolo contendere he waives the right to a trial; and

(5) That if he pleads guilty or nolo contendere, the court may ask him questions about the offense to which he had pleaded, and if he answers these questions under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or false statement.

W.R.Cr.P. 15(c).

■ Furthermore, the trial court must examine the defendant to determine the individual understands those rights. Finally, the record should establish that there is a factual basis for the plea and that the defendant knows the range of the penalties for the crime with which the person is charged. *Smallwood v. State,* 748 P.2d 1141 (Wyo.1988); *Hoggatt v. State,* 606 P.2d 718 (Wyo.1980); *Cardenas v. Meacham,* 545 P.2d 632 (Wyo.1976).

■ All of this occurred not once but twice in this case and, in addition, Osborn had the opportunity for a partially completed jury trial for another alternative. *State v. Glover,* 236 Neb. 402, 461 N.W.2d 410 (1990). *See also Zanetti,* 783 P.2d 134. A guilty plea is valid if it " 'represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.' " *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985) (quoting *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970)). *See also United States v. Ortiz–Alarcon,* 917 F.2d 651 (1st Cir.1990). Not only was this last effort provided carefully and comprehensively to provide Osborn with the highest level of due process and equal protection, but we have to admit in comprehensive review that this court does not know what further could have been granted except to excuse Osborn's participation in a course of conduct where ultimately two people were killed and the third was severely injured.

The conviction and sentences are affirmed.[11]

CARDINE, J., files a specially concurring opinion.

CARDINE, Justice, specially concurring.

I concur in the opinion of the court and add the following observation.

11. Since this case presented on appeal the issues of the appropriateness of the entry of Osborn's guilty plea, the proper jurisdiction of the sentencing court and the factual justification for the sentence, this decision now constitutes an exhaustion of available state remedies and res judicata for conviction and sentence.

This case presents a vivid picture of much that is wrong with our criminal justice system. We have a defendant who brutally, senselessly, cruelly and savagely beat, strangled, stabbed and raped; he left two persons dead, one seriously injured. He admits ordering the murders to "leave no witnesses." He has, under oath, confessed to the crimes twice in open court. Yet here we are, the case entering its ninth year with the court, still struggling toward a disposition of Mr. Osborn's case. This sad saga of multiple hearings, trials and courts involved should be required reading for legal scholars studying and writing about what can be done to improve the criminal justice system. At this time it can be found again on another journey through the federal court system.